**DAVIS TRANSPORT, Inc., Appellant,**

v.

**Lloyd Harold BOLSTAD et al., Appellees.**

No. 12874.

Court of Civil Appeals of Texas.

Galveston.

Nov. 15, 1956.

Dyess & Dyess and Arthur D. Dyess, Jr., Houston, for appellant.

Thos. M. Phillips and Wyatt H. Heard, Houston, Baker, Botts, Andrews & Shepherd, Houston, of counsel, Lockwood Jones, Cordell, Okl., for appellees.

GANNON, Justice.

This appeal is by Davis Transport, Inc., defendant below, from money judgments in

favor of Lloyd Harold Bolstad, Roy D. Cochran, and Nancy Britton Cochran, plaintiffs below, recovered on their respective claims for damages in a consolidated negligence action growing out of a highway collision accident occurring some twenty-six miles east of Big Lake, Texas, on Ranch Road 33 May 27, 1952.

The accident involved a truck of Perforating Guns Atlas Corporation operated by plaintiff Bolstad, one of its employees, in which Clarence Cochran, deceased, another employee, was a passenger, and another truck owned by defendant Davis Transport, Inc., and then being operated in the course of the latter's business by its employee, Joe Egleson.

Roy D. and Nancy Cochran are the sole surviving heirs and beneficiaries under the death statute of Clarence Cochran, deceased. Their claim was for loss of pecuniary benefits resulting from the accidental death of their son resulting from the collision, as well as for his conscious pain and suffering prior to death. The claim of plaintiff Bolstad is for personal injuries.

The trial was to a jury. Defendant's seasonable motion for a new trial was overruled, but on condition of the filing by plaintiffs of certain remittiturs, which condition was complied with. The appeal is duly and regularly before us on seventeen points of error assigned by Davis Transport, Inc., and as well on the claim by the plaintiffs Cochran that one of the remittiturs was erroneously required.

By its first two points of error appellant Davis Transport, Inc., complains that the court erred in overruling its motion for peremptory instruction, and that the answers of the jury which were determinative of liability are plainly wrong and contrary to the great and overwhelming weight of the evidence and should be set aside. We will discuss these together.

The road upon which the accident happened is of average width and hard surfaced. At or near the scene of the accident it traverses gently rolling territory and runs generally east and west. On the day of the accident Bolstad and young Cochran had left Big Lake, Texas, in a truck of Perforating Guns Atlas Corp. and had proceeded easterly for approximately thirty miles. The object of the trip was to deliver perforating guns to a Continental lease thought to be accessible by a north and south side-road or through a gate in a pasture at a point exactly twenty-six miles east of Big Lake. Before reaching this point Bolstad and Cochran had observed a sign indicating the nearby location of a Continental lease, but such sign was considerably closer to Big Lake than twenty-six miles and both supposed the lease to which this sign referred was not the one to which the perforating guns were to be delivered because the sign was too far short of twenty-six miles. Accordingly, they proceeded ahead easterly. At twenty-six miles there was no cross-road, no opening through any gate, and no signs indicating the presence in the vicinity of a Continental lease. They then proceeded farther easterly on the road to a distance of up to about thirty miles from Big Lake. At this point they made a U-turn and were proceeding back westerly upon the road over which they had come, when the accident occurred. The collision point, as claimed by plaintiffs, was somewhat short of twenty-six miles east of Big Lake, by as much as a half to three-quarters of a mile. At the point of the collision there was no cross-road, no gate or opening, or other indication of any way of ingress or egress to territory lying either north or south of the right of way fence.

The truck of defendant Davis Transport, Inc., involved in the accident was one in a caravan of four trucks which had left Houston the day before the accident around two o'clock in the afternoon. This was approximately twenty-four hours before the occurrence of the accident. Each truck of the caravan was heavily loaded with oil field pipe. The drivers of defend-

ant's trucks had stopped en route only for about five hours at Austin and for about two hours at Mason. At these places they had rested and slept in the cabs of their trucks.

As the Davis Transport truck caravan proceeded westerly on the highway, about thirty miles out of Big Lake, the first truck of the caravan overtook and passed the truck operated by Bolstad. Egleson's truck, being the one involved in the accident, was second in the caravan. Egleson was instantly killed in the collision of the two trucks and, of course, no testimony from him is in the record. The exact point of the collision is established at from about one hundred feet to two hundred yards west of the crest of a hill. Cochran, being dead, did not testify, and plaintiff Bolstad has no knowledge of what hit him. No person in position to give full and direct evidence of what actually occurred saw the impact of the trucks. At the time there was no other traffic in the vicinity except the two following trucks of the defendant's caravan and their view of the colliding trucks was obscured by an intervening hill. But all the evidence clearly warrants the inference that the Egleson truck collided with Bolstad's truck, generally speaking, from the rear. The physical damage to the two trucks would indicate that the impact was chiefly and originally between the right front of Egleson's truck and the left rear of Bolstad's truck. When the accident was over, the front of Egleson's truck was locked to the rear of Bolstad's truck. At rest after the accident, both trucks had made a 180° turn from the direction in which they had been proceeding, and were headed back in an easterly direction. When they came to rest the trucks were on the north shoulder of the road, up against the right of way fence. The condition of both trucks after the accident indicates with certainty that the impact of the collision was of tremendous force, very heavy damage being done to both.

Bolstad testified that immediately before the collision he was on his own right-hand or north side of the road, proceeding westerly at between thirty and thirty-five miles per hour; that he made no turn to or toward either side of the road; that he was looking ahead and saw no traffic. He further testified that at or about the time the collision occurred his truck was proceeding at a uniform rate of speed and had not been suddenly slowed down. On cross-examination he stated that he had testified on discovery deposition that he did not know whether he had applied his brakes just before the accident and that, like many of the things about the accident, he could not be certain whether or not he had applied his brakes. This discrepancy in Bolstad's testimony is emphasized by appellant, but Bolstad's admission of lack of certainty must be read in the light of other testimony on cross-examination to the effect that he was positive he had not applied his brakes, as far as he could tell. Much other testimony of Bolstad would indicate a good recollection of everything that occurred right up to the moment of the impact, and we have concluded that such conflicts as may exist in Bolstad's testimony were for the jury. Other testimony of those who came upon the scene immediately or shortly after the occurrence establishes the following: There was an awful mess ; the pipe on the Egleson truck was scattered over the road and in the bar ditch for a distance of fifty or sixty feet; the load of perforating guns on the Bolstad truck was also scattered; the net fence on the north side of the highway was broken through for a distance of one hundred to one hundred fifty feet, apparently this was caused by the jet guns which were being transported on Bolstad's truck. Some of these jet guns were alongside the fence and others had gone through the fence and into the pasture. Bolstad and Cochran were lying on the ground right at the fence cut, and in what was apparently the path of the perforating guns where they had gone through the fence. As observed above, the Atlas truck was locked at its rear with the front end of the Davis Transport truck and both vehicles were on the

righthand side of the highway and shoulder, pointed in the direction from which they had been traveling. The damage to the Atlas truck was primarily to the left and rear. Its bed had been moved forward into the cab. The rear wheels had been knocked out from under the truck. An expert testified that the force which caused the damage came from the rear of the Atlas truck. The damage to the Davis truck was observed as follows: Its front wheels were out from under it and it was torn up so badly that only one bolt was holding the remains together. The front bumper with A-frame and flagpole were knocked off, one of the flagpoles was knocked off the bumper—this was the one on the right side—however, the A-frame attached to the center portion of the bumper had not been damaged. The significance of this, it is claimed, is that it would have been impossible for the A-frame of the bumper to have gone in underneath the rear of the Atlas truck without being damaged. The Davis truck was painted red. After the collision there was red paint on the left rear wheel of the Atlas truck.

A State highway patrolman testified that the pavement and shoulders were dry; that the road at the point of the accident was straight for some distance each way; that most of the damage to the Atlas truck was on the lefthand, rear corner; that the Davis truck was practically demolished; that there were two skid-marks on the righthand or north side of the highway, one seventeen inches to the north of the center line and the other farther to the right, or north; and that these skid-marks continued on the pavement a distance of seventy-five feet, eight inches, where they left the pavement and proceeded for an additional forty-eight feet to the position of the vehicles at rest after the accident. These were dual-wheel skid-marks, but the officer was unable to say which vehicle had laid them down. The officer found no debris, oil or gas on either side of the road, but, in addition to the skid-marks, the officer and

several witnesses testified to damage to the north portion of the concrete pavement evidently made when the collision took place. No such damage was observed on the south side of the road. All of the physical evidence indicates cogently that the collision took place on the north, or righthand, side of the road for the direction in which both vehicles were moving. Neither brief points us to any evidence which would indicate that the collision took place on the south, or left-hand, side of the road, according to the direction in which the vehicles were moving. An expert testified as follows:

"Q. Could you tell from which direction the truck [the Atlas truck] had been struck by looking at the damage?

"A. On the rear. In other words, the most of it was done—it was hit from the rear, which caused the damage done in that particular part of the truck."

Joe Moore, one of defendant's truck drivers, called as an adverse witness, testified that when his following truck reached the scene of the collision, he examined the pavement and found skid-marks. He stated, "I seen where Joe [Egleson] braked his trailer, his brakes." He further testified that these skid-marks led up to where Egleson's truck turned over and that the next day the brakes of the Egleson truck were still locked and that the air tank had to be bled to release them. Though appellant later objected to similar testimony, the foregoing testimony came in without objection. The witness did not attempt to testify as to when or how the brakes became locked.

The plaintiffs do not rely upon the res ipsa doctrine, held under some circumstances to be applicable to rear end collisions, especially where the proof negatives any sudden stopping of the lead car. On the other hand defendant plead and relied upon specific acts of negligence, including the following: common law speed, statutory speed, lookout, abruptly applying

brakes of the Egleson truck so as to throw it out of control, failing to turn the defendant's truck to avoid the collision, following too closely, lack of control, and violation of Article 911b, § 6–cc., V.A.T.S.

 Defendant says its motion for an instructed verdict should have been granted because the evidence shows no more than the occurrence of an accident which of course raises no presumption of negligence on the part of anyone. Cited in support of this proposition are Rankin v. Nash-Texas Co., 129 Tex. 396, 105 S.W. 2d 195; Dixon v. Burling, Tex.Civ.App., 277 S.W.2d 957; Conner v. Chatman, Tex. Civ.App., 272 S.W.2d 136. These cases correctly state the law, but we do not consider them applicable to the facts of this case. Negligence, like any other ultimate fact, may be established by circumstantial evidence. See Texas Employers Ins. Ass'n v. Texas Compress Co., Tex. Civ.App., 284 S.W.2d 922, and cases therein cited. Of course, where the evidence is so evenly balanced that reasonable minds could not legitimately infer negligence as more probable from the circumstances established than its absence, plaintiff fails to meet his burden of proof. Davis v. Castile, Tex.Com.App., 257 S.W. 870; Comet Motor Freight Lines v. Holmes, Tex.Civ.App., 175 S.W.2d 464. The statement of the holding in the latter case appearing in appellant's brief is thought to be incorrect. It is claimed by appellant the case holds that "If an inference of facts consistent with no liability is *just as valid* as an inference of fact legally resulting in liability, the trier of the facts is not warranted in finding the facts of liability on an inference." (Emphasis supplied) This is but another way of saying that in a civil case before liability can be established on circumstantial evidence, the evidence must be inconsistent with every other reasonable hypothesis. That, of course, is not the rule. The true rule in negligence cases, as we apprehend it to be, is that where the circumstances are such that reasonable

minds may logically draw either an inference of actionable negligence or its absence, the issue is one of fact for the jury and not one of law for the court. Where circumstantial evidence is relied on, only when the evidence is so evenly balanced that it permits only of speculation, surmise and suspicion, does plaintiff fail to make a case to go to the jury.

We have concluded that the foregoing circumstantial evidence as amplified in the record would support affirmative findings of actionable negligence in each of the following specific particulars as pleaded by plaintiffs, to wit: common law speed, lookout, failing to turn defendant's truck so as to avoid the collision, following too closely, and lack of proper control.

The defendant seeks to support its claim of error in overruling its motion for peremptory instruction as to the Cochran claims on the further ground that the evidence was insufficient to establish any legally recoverable damage. We overrule this point. The evidence on the damage legally recoverable by the Cochrans will be noticed later. The court correctly overruled the motion for an instructed verdict.

 In answer to properly submitted issues, the jury convicted defendant of actionable negligence in the matter of lookout, proper control, and for failure to turn its truck immediately before the accident so as to avoid a collision. We do not think that any of these findings are plainly wrong or contrary to the great and overwhelming weight of the evidence. If any one of such grounds of actionable negligence is supported by sufficient evidence, the judgment must stand, unless erroneous for some other assigned reason.

The jury exonerated defendant from negligence in respect to speed. Assuming this finding to be correct—and defendant maintains it was—it is our view, assuming that Bolstad, as he testified, did not suddenly apply his brakes before the ac-

cident, that the evidence is fully in support of the jury's findings of negligence on the part of Egleson in failing to have his truck properly under control by reason of improper lookout and in failing to turn it either to the right or left before striking the Bolstad truck so as to avoid the accident. In arriving at this conclusion we, of course, have taken into consideration, as emphasized by defendant, that the jury may have felt it was impossible to know which of the two trucks laid down the skid-marks. Certainly, the jury's finding exonerating defendant from negligence in respect to speed appears to indicate that possibility. We feel the jury probably gave very little weight to Moore's testimony, stating that the skid-marks on and off the pavement which led up to the Egleson truck were laid down by it.

Appellant complains of the admission in evidence of a diagram prepared by Officer Vick D. Atwood as a part of his official duties. This diagram purports to show not only the position of the trucks after the collision, but as well their position on the highway at and immediately before the collision. It is undisputed that Officer Atwood did not actually witness the accident and that he did not come upon the scene until after it had occurred and the vehicles involved had come to rest on the north shoulder of the highway. The objection seems to be that the diagram is hearsay *in so far as it purports to place the position of the vehicles at and before the actual occurrence of the collision.* Counsel for defendant took the witness on cross-examination and established by him that he was absolutely unable to tell which of the two vehicles laid down the skid-marks. At this point counsel for defendant moved the court as follows: "In the light of that I move again that this diagram with the position of the vehicles, etc., based purely on speculation on this officer's part, be stricken." The motion was denied and the diagram was left before the jury. There

was no motion for the jury to disregard *so much of the diagram* as purported to place the position of the trucks before and at the time of the collision.

We have no doubt it was technical error for the officer to be allowed to place the position of the vehicles before the occurrence of the accident. Admittedly he had no personal knowledge of this. However, the evidence is so convincing that the accident happened on the north, or righthand, side of the highway while the two vehicles were in line proceeding in a westerly direction, with defendant's vehicle overtaking plaintiffs' vehicle, that we are wholly unable to see any prejudice to defendant from the admission of the diagram, even had defendant moved its admission for only the limited purposes for which it was obviously competent. We feel the diagram, in so far as it purported to place the position of the vehicles before the occurrence of the collision, when viewed alongside the contents of the entire record and the officer's admission that he was unable to tell which of the two vehicles laid down the skid-marks, could not possibly have had any real weight with the jury. The officer's testimony negatived any effort to establish the absence of any sudden stopping or slowing down of the Bolstad truck and the evidence, though circumstantial in nature, is overwhelming that the two vehicles must have been in approximately the position shown by the diagram at and immediately before the actual occurrence of the collision.

Appellant next complains of the admission of testimony given by the witness King Ramsey concerning a certain statement made to him by Mr. Bolstad in the emergency room of the hospital at Ozona some two and one-half to three hours after the occurrence of the accident. This statement was made by Mr. Bolstad just as he was leaving the emergency room and being taken to his own private room. The testimony was objected to as

a self-serving declaration. The testimony is fully shown by the following question and answer:

"Q. Now, just tell the jury what was said by Mr. Bolstad at that time.

"A. I asked Mr. Bolstad what caused the accident and he told me that he was driving down the road on his own side of the road and nobody was in front of him and he didn't know who had hit him and the next thing he knew he was in the hospital."

On defendant's cross-examination of plaintiff, it had attempted to establish certain statements claimed by defendant to have been made by plaintiff to one Mr. A. Carruthers some time after the accident, substantially to the effect that plaintiff didn't know *what had happened out there that day*. Plaintiff made the qualified admission that he had told Carruthers that he didn't know what had hit him and that "I didn't know what exactly happened *after* I had been hit." Defendant later offered the witness A. Carruthers, who testified to a conversation with plaintiff Bolstad after the accident, as follows: "I asked him if he remembered anything that happened out there at the wreck and he said no, that he didn't, he didn't remember a thing."

Plaintiffs contend that Mr. Ramsey's testimony concerning Mr. Bolstad's statement made at the hospital is admissible both as res gestae and as proof of a prior consistent statement, plaintiff having been charged with making statements inconsistent with his testimony at the trial, i. e., *fabrication of testimony*.

 We find it unnecessary to consider whether the testimony was admissible as a prior consistent statement because we are fully convinced it was admissible as res gestae. The evidence shows that Bolstad was rendered unconscious in the collision; and that he regained consciousness, but only for a few seconds, in the ambulance while being transported to the hospital, at which time he asked where he was and was told that he would be in the hospital in a few minutes. Almost immediately Mr. Bolstad lapsed back into unconsciousness. He next remembers seeing the doctors sewing up his arm in the emergency room, where again he regained consciousness for a few seconds, at which time he was suffering no pain and was conscious of no hurt. Mr. Bolstad next regained consciousness when in his private room, some two days after the accident occurred, at which time he first discovered that his leg was in a cast. From the foregoing it is evident that the statement Mr. Bolstad made to Mr. Ramsey while he was leaving the emergency room must have been made during a period of only a few seconds of consciousness. In our opinion it was clearly admissible as res gestae. Missouri, K. & T. Ry. Co. of Texas v. Anderson, Tex.Civ.App., 198 S.W. 795; Missouri, K. & T. Ry. Co. of Texas v. Moore, 24 Tex.Civ.App. 489, 59 S.W. 282; Southern Surety Co. v. Weaver, Tex.Com. App., 273 S.W. 838. The fact that the statement by Mr. Bolstad was made in response to a nonleading question does not render it inadmissible as res gestae. See 17 Tex.Jur., page 620, and cases cited.

Defendant's employee, R. J. Moore, called as an adverse witness by the plaintiffs, testified *without objection* that when he came upon the scene of the accident—he had been following behind the Egleson truck—he looked at the pavement for skid-marks and saw "where Joe [Egleson] braked his trailer, his brakes"; that he saw skid-marks leading right to where the truck turned over and that the next day the brakes on the Egleson truck were still locked so that the air tank had to be bled to unlock them. Later in the course of his examination he was referred to his previous testimony and again questioned as follows: "Now, these skid marks that you have told me about, you conclude that they were made by Mr. Egleson's truck?" The question was objected to as calling for a conclusion. The objection was overruled and the witness was per-

mitted to answer, as follows: "By his trailer."

■ Where a witness has previously testified without objection to matter later objected to, the objection comes too late. Hubbard v. Harris County Flood Control District, Tex.Civ.App., 286 S.W.2d 285.

At the trial, over the objection that the evidence was self-serving, a matter taking place between the lawyers, and improper, plaintiff was permitted to prove that when his discovery deposition was taken in advance of trial and upon being requested by defendant to submit to examination by a doctor of its choice, Burton Anderson, M. D., plaintiff then turned to his lawyer, Mr. Phillips, and asked, "Is that O. K. with you, Mr. Phillips?" To which Mr. Phillips rejoined, "I say this to you, Mr. Bolstad, under the law you are not obligated to give Mr. Dyess * * * an examination by a doctor of their choice and if Mr. Dyess is willing to pay, as he has indicated he will, the expense incident to your staying over, and if it is agreeable with your employer, I personally have no objection to it. I take it you have nothing to hide in this lawsuit about your condition. Is that so?" To which the plaintiff Bolstad answered, "Yes, sir." The record further reveals that Bolstad did submit himself to examination by Dr. Anderson, both before the trial and in court, and that Dr. Anderson's testimony sharply rebutted Bolstad's claims of disability. In the course of his cross-examination Dr. Anderson was permitted to testify without objection by defendant that he, Dr. Anderson, found Bolstad willing to answer all his questions, wholly lacking in evasiveness, and sincere so far as a trained doctor could tell; and further, that Dr. Anderson had no reason to doubt either Bolstad's credibility or his honesty.

■ We are inclined to think the evidence was independently admissible to rebut defendant's claims that plaintiff was exaggerating his disability and therefore insincere and dishonest; however, if we be wrong about this, we hardly see how de-

fendant is in position to complain or claim injury while permitting its own doctor to testify, without objection, in effect that plaintiff was a straight-forward, nonevasive, sincere, credible, honest, person. In fact, the matter impresses us as comparable to the conduct of defendant's counsel in bolstering up Dr. Anderson's credibility before he had testified to any material fact, by having him testify that the firm of lawyers representing plaintiff had used him on occasion as an expert witness; and this before Dr. Anderson's competency or credibility had been in any way attacked. Such trifling matters have never been held reversible error in our jurisdiction even when clearly improper. Here, in view of the testimony of Dr. Anderson, which was unobjected to and no doubt of far greater probative value with the jury on plaintiff's honesty than the proceeding complained of, we are completely unable to see any substantial harm to defendant on the matter assigned.

■ On direct examination plaintiff Bolstad was asked if before the accident happened he had any way of anticipating "that some truck or vehicle was going to come up from behind and hit you." Over the objection that the question was leading and suggestive and assumed facts not in evidence, the witness was permitted to testify, "No, sir, I had no reason." This is assigned as reversible error. Plaintiff had previously testified without objection that at the time of the accident he had passed over the crest of a hill and was going down a slight incline over one hundred feet from the hill's crest; that he was knocked unconscious in the accident; that at the time of the accident he was going between thirty and thirty-five miles per hour straight west, looking ahead, and saw no approaching traffic; that he did not apply his brakes; and that he had no knowledge of what hit him. He was permitted to testify without objection as follows:

"Q. Did you ever see the truck that hit you before it hit you?"

"A. No, sir."

We do not think it can be said that the question assumes facts which at the time the question was asked were "still far from their proof here in evidence" nor do we consider the question in any way leading. It does not suggest an answer. In fact, it could have been answered as follows: "Yes, by looking through my rear-view mirror." If the question may be said to be oratorical or argumentative, it was not objected to on that ground. Furthermore, it can hardly be said in the light of Bolstad's testimony which preceded it that the answer gave the jury any information or facts it did not already have.

Appellant assigns as reversible error testimony by Roy Moore, an employee truck driver of defendant, called as an adverse witness by plaintiff, substantially to the effect that at the scene of the accident Egleson could have brought his truck to a stop in 75 to 80 feet, bearing in mind the topping of the road and its condition, and assuming that Egleson was traveling at a rate of thirty-five miles per hour, and bearing in mind also the load on the truck, such stopping distance being stated by the witness to be the distance *after the brakes were applied and took hold.* The question was objected to because it assumed "a condition confronting Mr. Egleson, and assumes that witness knows the conditions confronting Mr. Egleson at the time and assumes that the witness could have had it [the stopping] in his mind at exactly the same time as Mr. Egleson" and on the further ground that the witness was not shown to have "had any experience by way of expertness on testifying that one of these trucks could be stopped under those circumstances or *in like cases.*"

Before the question was propounded, it was shown that the witness, Egleson, and two other drivers were operating four trucks of a convoy which on the occasion in question were following closely one upon the other, and that the witness came upon the scene of the accident within minutes, or less, of its occurrence. Also the witness was shown to be in the employ of Davis Transport, Inc. and to anticipate continued employment by defendant. Further, though the witness did not actually see the collision, it was shown that at the time of its occurrence he and Egleson were going to the same place, were members of the same convoy consisting of four trucks loaded with oilfield pipe; that witness was "tailing up" the convoy; that the witness was familiar with weather conditions obtaining at the time of and at the scene of the accident, and that he knew that the weather was fair, and that the road and shoulders were dry; that he knew that the accident happened on a gentle downslope about two hundred yards west of the crest of a hill on a two-lane paved highway with a center line painted down the middle; that witness saw the wreck on the right-hand side of the pavement as he came over the crest of the hill. Before the question was asked the witness had described conditions at the scene of the accident in detail as well as the position of the trucks when they came to rest, including a full description of the damage to both trucks. It was further shown that the witness had examined the pavement for skid-marks and had seen skid-marks where Egleson braked his truck. The witness described these marks as straight until they curved to the right over to the shoulder of the road, and as leading right up to "Joe's" truck. The witness was shown to be familiar with the load on the Egleson truck, which he described as sixty joints of five-inch, 14½ or 15 pound, heavy steel pipe from twenty-seven to thirty feet in length. The witness was shown to figure the load to weigh around 30,000 to 31,000 pounds. The witness was shown to have examined the brakes on the Egleson truck after the accident and to be familiar with the fact that there were brakes on the trailer as well as the tractor. The witness was further shown to be familiar with the fact that the Egleson truck was equipped with air over hydraulic brakes in good condition, and that it was the best equipment available. The witness testified that he was familiar with the distance it would

take the brakes on the Egleson truck to stop it *after being applied*. The complained of testimony was not developed until after all the foregoing was shown. We have not been directed to any part of the record showing any effort on the part of the defendant to discredit the testimony complained of either on cross-examination of Moore or by other witnesses. Defendant was undoubtedly in position to do so if the testimony could be discredited. Before giving the testimony complained of, the witness had testified that his experience with his own truck in stopping it and using its brakes "would be about the same experience you would expect *any driver* that was operating the truck that Egleson was driving to have."

When the entire record is looked to, we are satisfied Mr. Moore was eminently qualified to give testimony in respect to the distance in which the Egleson truck could have been stopped after the brakes were applied and took hold as it was proceeding down the gently sloping hill in question, considering the load, weather and road conditions and assuming a rate of speed of thirty-five miles per hour. If, then, the testimony was objectionable it must be because the witness was asked to state in what distance Mr. Egleson, as distinguished from an ordinary driver, could have stopped the truck, or that it assumes a knowledge by the witness of the actual details of the accident as they confronted Mr. Egleson. We have been unable to convince ourselves that the jury could have been misled into assuming that Mr. Moore was purporting to testify to anything more than that an ordinarily competent operator could have stopped the Egleson truck, under the assumed conditions and at the assumed speed, within seventy-five or eighty feet by way of a service rather than an emergency application of the brakes. Immediately after the testimony complained of the witness made it plain that if Egleson was going down the road at thirty-five miles per hour and wanted to stop he could have done so within seventy-five or eighty feet without hurting anything; whereas, if he stopped too quick the load of pipe would have slid over onto the cab. That the jury could not have believed the witness was trying to testify in reference to any emergency condition confronting Mr. Egleson is demonstrated, we think, by the witness's express testimony that he did not see the accident happen "when these two vehicles came together" because of an intervening hill, and by the further fact that when asked to testify that the pipe did slide in on Mr. Egleson the witness stated, "I don't know what happened." Of course, no expert witness should be permitted to testify to what a particular person of particular temperament and ability could do under emergency circumstances. But here the witness was shown to be fully familiar with all facts and circumstances material to stopping distance at the *scene of the accident* as distinguished from the *occurrence of the accident,* and we think the testimony as the jury must have understood it was such as may be given by a witness of the qualifications Mr. Moore was shown to have. We are unable to say that the testimony, even if erroneously admitted, was calculated to cause, and probably did cause, a different verdict than would otherwise have been returned. We feel, since the jury actually exonerated Egleson from negligence in regard to speed *as such* and convicted him only of negligence in failing to keep a proper lookout, in failing to turn the truck so as to avoid an accident and in failing to have his truck under proper control, that the probative effect, if any, of the testimony on the verdict actually returned was slight. In fact, the finding of the jury exonerating Egleson from negligence in the matter of speed, when viewed in the light of the undisputed testimony in regard to the length of the skid-marks, rather indicates the jury considered the circumstantial evidence too speculative to establish that the skid-marks were laid down by the Egleson truck. It is a well known fact that a violent blow can cause air brakes to engage automati-

cally. At any rate, assuming as established by the verdict, that the Egleson truck was not being driven at an excessive speed, the complained of testimony is without probative value or effect on the issue of lookout and the jury's verdict establishing actionable negligence in that respect is sufficient alone to sustain the judgment.

The evidence shows that the Bolstad truck was transporting perforating guns, described as lengths of pipe loaded with explosives which are used in oil production operations. The truck had an uncovered flat bed with siding apparently about two or three feet in height, and a tail-gate which when fastened in place was of similar height. The guns were loaded in the truck lengthwise and secured against falling out by the tail-gate and the siding. There is no claim the guns were fastened or secured by chains or ropes. Defendant's trial pleading contained a general plea of contributory negligence. Defendant developed that though Bolstad testified the tail-gate was fastened at the time of the collision, it was down when the Bolstad truck came to rest after the collision.

At the request of defendant, the court submitted, on the theory of Bolstad's possible contributory negligence, the following special issues, prepared by defendant, all but the first being conditionally submitted:

Special Issue No. 25

"Do you find from a preponderance of the evidence that Lloyd Harold Bolstad failed to fasten and secure his load of jet perforating guns?"

Special Issue No. 26

"Do you find from a preponderance of the evidence that the failure of Lloyd Harold Bolstad to fasten down and secure his load of jet perforating guns was negligence, as that term has been defined herein?"

Special Issue No. 27

"Do you find from a preponderance of the evidence that such negligence, if any,

was a proximate cause *of the collision in question?*" (Emphasis supplied.)

Special Issue No. 28

"Do you find from a preponderance of the evidence that such negligence, if any, was a [the?] sole proximate cause of the collision in question?"

■■ The jury answered Special Issue No. 25 in the negative. They did not answer Special Issues 26, 27 or 28. Defendant says that the answer to Special Issue No. 25 is not supported by the evidence, is clearly wrong, and for that reason the trial court should have granted a new trial. Under our present rules, the fact that defendant requested the issues does not estop it to complain that the answer actually returned by the jury to Special Issue No. 25 is contrary to the evidence.

It will be noted that the jury was not questioned in respect to whether the negligence inquired about contributed to the injuries, but only whether it was a, or the, sole "proximate cause of the *collision* in question." Though we feel as a matter of law that there was no evidence from which it could be said that any failure on Bolstad's part to fasten down and secure the load of perforating guns was a proximate cause of the *collision itself* as distinguished from contributing to *the injuries and death involved* by reason of the fact that after the collision occurred the jet guns may have struck either Bolstad or Cochran, or both, we will, nevertheless, discuss appellant's point.

■■ The word "fasten" in the sense here used is defined in Funk & Wagnall's Practical Standard Dictionary as follows: "To secure in place by *any physical means.*" The word "secure" is defined in the same dictionary in the sense here used as follows: "To fasten or *confine* so as to prevent from getting loose." We take it that it may be safely said the words are synonymous. While both would include a physical

954

tying down with chains or ropes, neither is limited to such particular means. It seems to be defendant's position that the evidence demanded an affirmative answer to Special Issue No. 25 because the only means used by Bolstad to fasten or secure the load of perforating guns was to encase it in the open box-like sides of the truck bed by fastening and securing the tail-gate, it being undisputed that the perforating guns were not roped or chained down. But that was not the issue which defendant requested and obviously the undisputed testimony does not demand a finding that Bolstad proceeded along the highway before the accident with the tail-gate and sides of the truck bed not in place and securing the load of perforating guns. We see no merit in this point.

■ Mr. Roy D. Cochran, father of the deceased, Clarence Cochran, was permitted to testify on the issue of the direction from which the blow to the Bolstad truck came, as well as upon the issue of its force, that he viewed his son's corpse and that right behind the boy's left ear there was a hole as big as a fist in the back of the head—in the back of his hair. It was plaintiff's theory that the blow to the Bolstad truck had come, not at an angle, but directly from behind; whereas, it was defendant's theory that the blow had come somewhat from the side, defendant claiming there were circumstances from which the jury could have found that when the collision occurred the Bolstad truck was being turned to its left. Mr. Cochran's testimony was objected to as immaterial and irrelevant to any issue in the case and as being offered solely to create sympathy, and on the ground it was not shown that when Mr. Cochran saw the boy that the body was in the same condition as when the boy died, and as incompetent for the purpose of which it was offered. It was shown that at the time of the collision Clarence was seated in the cab of the truck alongside of Bolstad and to his right. We are of the opinion that the testimony was competent and admissible along with

other circumstances as tending to show that the blow to the Bolstad truck came while it was proceeding straight ahead along the road rather than, as contended by defendant, while it was in the process of making a left turn. If, as defendant contends, the evidence was inflammatory, it certainly was no more so than proof in a damage suit that defendant carries liability insurance. Such proof has been held admissible when independently relevant and competent, regardless of inflammatory effect. Aguilera v. Reynolds Well Service, Inc., Tex.Civ.App., 234 S.W.2d 282, writ refused. Furthermore, the jury was expressly instructed that in assessing damages on account of Clarence Cochran's death, they would not consider for any purpose grief, sorrow, or distress of mind suffered by Clarence Cochran's surviving parents. This being so, since to our minds there is nothing in the record to indicate the verdict is the result of passion, the testimony is not shown to have been of probable prejudice to defendant.

■ Appellant assigns as error certain argument which appellant informs us was made to the jury by plaintiff's counsel. The fact of the making of the argument is nowhere reflected in the record either in the statement of facts or by bills of exception; however, it is assigned in the motion for new trial. The argument is not before us for review. McGee v. McGee, Tex.Civ.App., 237 S.W.2d 778; Fort Worth & Denver Ry. Co. v. Ferguson, Tex.Civ. App., 261 S.W.2d 874.

■ Over the objection of immateriality, Dr. A. E. Wiedeman was permitted to testify that when the Doctor saw young Cochran brought to the hospital dead he appeared to have been seriously injured prior to his death; that the body was mangled and mutilated almost beyond recognition. Other evidence would permit the jury to draw the inference that the deceased boy suffered conscious pain during the short time he lived after the accident. The testimony of Dr. Wiedeman was clear-

ly admissible on the nature and extent of injuries as bearing upon the nature and extent of conscious pain and suffering of the deceased.

Defendant presses upon us the contention that the judgment in favor of the Cochrans includes amounts for conscious pain and suffering of their son and that there is simply no evidence in the record to show that Clarence Cochran consciously suffered pain before he died. In support of its position, we are referred to certain testimony of Dr. Wiedeman, who saw the boy upon his arrival dead at the hospital after the accident and who expressed the opinion that the corpse gave every indication of instantaneous death; that Clarence certainly died within a matter of a few seconds after being hit and that on such assumption Clarence did not experience any conscious pain or suffering before death. However, defendant's presentation ignores the testimony of its employee witness, Mr. Moore, who arrived on the scene of the accident very shortly—within a matter of minutes—after the collision occurred, in relating how he could tell—referring to Clarence—that the boy was badly hurt. Mr. Moore testified:

"A. Well, this boy was trying to get up. He would get up on his all fours and fall. I walked up there to him and told him to sit down; that we would get him an ambulance. He sat back down there and in just a minute, why, I looked at him and something was running out of his nose. It looked like it was bloody water or something. It just puffed out. It looked like a kid blowing on bubble gum. It looked like two big red bubbles.

"* * *

"Q. Did he seem like he was in pain? A. Yes, sir. He looked like he was trying to get up and ask for help.

"Q. And what did he say when he asked for help? A. He just said, 'Come here. Come here.'

"Q. Were his eyes open? A. Yes, sir.

"Q. What did you notice about his eyes? A. Well, they were open and his forehead, why, it looked like something hit him there.

"Q. How long did he stay alive? A. I guess about ten or fifteen minutes, I imagine.

"Q. It could have been over that? A. Yes, sir, it could have been."

We overrule the point. Obviously the jury could conclude from the foregoing testimony that Clarence Cochran survived for ten or fifteen minutes, possibly longer, after the collision and that during such period he suffered consciously. We rule there was competent evidence to go to the jury on the issue of damages for conscious pain and suffering.

Appellant complains of the action of the trial court in admitting testimony of Roy D. Cochran, father of the dead boy, concerning farm work which had not been done after his son's death, the basis of the objection being that the testimony was not material; that "they [the parents] are entitled to show what contributions might have been expected, but not what has happened since." We overrule this point. The materiality of the testimony will appear in our review of the evidence responsive to appellant's complaint that the verdict in favor of the Cochrans is excessive.

We next consider appellant's claim that the $45,000 verdict in favor of plaintiff Bolstad was excessive by $35,000 which excessiveness was not cured by the trial court requiring a remittitur of only $5,000. Under this point it is appellant's position that there is no evidence to justify a verdict in Bolstad's favor in excess of $10,000.

Though we do not review the evidence in full detail, we think the verdict itself, even before the remittitur, was fully

justified by evidence which would support the following: When the accident occurred, Bolstad was twenty-nine years of age with a life expectancy of 38.61 years. He had only an eighth grade education. He was in good health and of sound body. At the time of the accident Bolstad was working as a rigger for Perforating Guns Atlas Corporation, performing hard manual labor, including heavy lifting, climbing ladders and driving a truck. The seriousness and painfulness of Bolstad's injuries is inferable from the fact that his doctors did not expect him to survive. Though admittedly he has made a remarkable recovery, a severe crushing blow to his left knee has left him a permanent cripple. Bolstad can never again perform manual labor. He is unable to climb stairs without the aid of a handrail because his left knee, when flexed, will not support his body. Standing long hours is contra-indicated and long continued use causes a trepidation and flutter of the knee joint. His disability, confined to the leg alone, is 60% after reaching maximum recovery. In all probability as Bolstad increases in age he will develop traumatic arthritis in and stiffness of his knee. Prior to the accident Bolstad was earning wages as a rigger which produced on the average more than $400 per month. His employers considered him a conscientious, capable worker; his immediate superintendent had recommended him for promotion to a position which would have increased his pay to $500 per month. Because of physical infirmities Bolstad is no longer in line for promotion.

Presently he is retained in the employ of Perforating Guns Atlas Corporation, assigned to light duties, answering the telephone, dispatching crews, and other light work. None of his duties involves manual labor. His present pay has been reduced to $300 a month, a differential of $200 per month under what he would have received had he been promoted to shooter at $500 per month. Bolstad spent seventy-two days in the hospital with a cast on his leg and had several painful rib fractures, and has experienced considerable pain in his leg since the accident, which it is expected will not only remain but will increase in future years. We consider the judgment fully supported by the evidence, and are at a loss to understand upon what theory the trial court, who assigned no reason therefor, required a remittitur of $5,000 on Bolstad's verdict alternative to granting a new trial.

The jury's award to the Cochrans of $16,000 was reduced by the trial court to $11,000. Appellant, though not concerned with the apportionment by the jury of the $16,000 award—$1,000 to the father, and $15,000 to the mother—contends the judgment remains excessive, even after remittitur, by $7,000. Differently put, defendant says the evidence is insufficient to sustain an award to the Cochrans of more than $4,000.

The evidence on conscious pain and suffering, damages for which may be included in the award, has heretofore been reviewed. How the jury's allowance, if any, for conscious pain and suffering, is reflected in the verdict, cannot be determined since the aggregate of all the Cochrans' damages, both as heirs and surviving beneficiaries under the death statute, of Clarence Cochran, was, under the instruction of the court, determined in response to a single issue at $16,000, apportioned as stated. The evidence showed the Cochrans were farmers and that their livelihood was derived almost entirely from the operation of their farm. Both Mr. and Mrs. Cochran were advanced in years and because of age and poor health unable to perform hard manual labor around the farm. Prior to leaving home, shortly before his fatal accident, to accept temporary employment during a lull in farm operations, the deceased, Clarence Cochran, according to the evidence, had been a pillar of strength to his parents in their successful farming operations. Not only had he performed all the heavy work, but apparently had assumed, almost entirely,

responsibility for managerial decisions. The deceased was intensely interested in farm work and was the only one of the Cochran children who cared for it. Young Cochran's work for his parents was not for wages, but only for spending money; though he at times made a small crop on his own behalf. After quitting school, Cochran helped on the farm until a short time before he was killed. Before his death he was carrying on all the heavy farm work, such as running the tractor, breaking and preparing the ground, etc. His parents, because of advanced age, were physically unable to perform this labor. Clarence was a good hand with cattle. He took the lead as between himself and his father in deciding what work needed to be done, what land to break and how much; he alone on the farm fixed and ran the hay baler. He was industrious and always ready to work. Before leaving to accept temporary employment, Clarence had planned to lay in his father's crop later in the year 1952. Clarence's death has placed an awful drawback (financially) on his father since it has put a load of work on him he cannot do. Since Clarence's death Mr. Cochran has planted less land and run less cattle than before, because he is unable to handle the work by himself. His herd of cattle is reduced from 100 or 150 to 50 or 60 head. Because of Clarence's absence, the father has been unable to make a cotton crop on 100 acres of his bottom land. Mr. Cochran testified that as a direct result of the loss of his son, his gross income had dropped from $20,289.69 in 1952 to $9,391.24 in 1953. The Cochrans had every reason to expect their son to continue in the future to help them on the stated basis, unless marriage should bring necessity for a more generous return to Clarence for his work in their farming operations. Mrs. Cochran testified that since the death of the boy they had not done so well in their farm work, that none of their other children worked, or would work, on the farm. At the time of the trial, some two years after the acci-dent, Mr. Cochran was 62 years of age, and Mrs. Cochran was 56 years of age.

Whereas appellant contends the above evidence is insufficient to support an award in favor of the Cochrans in excess of $4,000, the appellee Cochrans maintain that it was fully sufficient to support a much larger sum than the $16,000 which the jury awarded, and they ask us, pursuant to Rule 328, T.R.C.P., to rule that the trial court should not have required a remittitur of the Cochrans and to modify the judgment in favor of them for an additional $5,000 to conform with the jury's award.

Here the trial court assigned no reason for the required remittitur. In the light of the evidence, we see no legal justification for reducing the jury's verdict in favor of the Cochrans and for that reason think that the trial court, under the facts, was unauthorized, on any principle of judicial discretion to which we have been referred or known to us, to condition the overruling of defendant's motion for new trial on the filing by the Cochrans of a remittitur. If, as may be, the trial court was impressed with what seems to be appellant's argument that the Cochrans should be limited to cash money contributions, suffice it to say we think the argument is insupportable. This is far more than a case, as claimed by appellant, where the evidence shows only that the parents were supporting the boy by paying him wages for farm work. The ruling of the Dallas Court of Civil Appeals in Tarrant County Water Control and Improvement District No. 1 v. Fowler, Tex.Civ.App., 175 S.W. 2d 694, 695, in reforming a judgment by restoring the amount of a remittitur, was fully approved by the Supreme Court. See the Supreme Court opinion in writ of error in the same case, 142 Tex. 375, 179 S.W.2d 250. See also Red River Valley Pub. Co., Inc., v. Bridges, Tex.Civ.App., 254 S.W.2d 854. We overrule appellant's complaint of excessiveness of the verdict fixing damages in favor of the Cochrans, and sustain the

Cochrans' point assigning that the remittitur should not have been required.

We trust the unusual length of this opinion is not an imposition on the Bar; however, counsel for both parties have made a notably full and commendably able and helpful presentation of their contentions, and we feel the talent, energy and zeal exhibited entitle them to a full expression of our views.

Reformed and affirmed, Associate Justice CODY not sitting.