17061

C. R. SMITH, Administrator of the Estate of Mary Alice Williams, Respondent, v. DOUGLAS P. HARDY *ET AL.*, Defendants, of whom Douglas P. Hardy and James M. Bryant are Appellants.
C. R. SMITH, Administrator of the Estate of Janare Williams, Respondent, v. DOUGLAS P. HARDY *ET AL*, Defendants, of whom Douglas P. Hardy and James M. Bryant are Appellants

(88 S. E. (2d) 865)

*Messrs. Whaley & McCutchen,* of Columbia, and *E. M. Floyd, Jr.,* and *Walter E. Anderson,* of Hartsville, *for Appellants,*

*Messrs. James P. Mozingo, III,* and *John L. Nettles,* of Darlington, and *Edward E. Saleeby,* of Hartsville, *for Respondents,*

*Messrs. Hope, Willcox & Cabaniss,* of Charleston, *for Respondents, Albert Saleeby as Temporary Administrator of the Estates of Zachary Williams* and *John J. Williams,*

September 7, 1955.

OXNER, Justice.

Each of these actions was brought to recover damages for alleged wrongful death. They grew out of a collision between a tractor-trailer owned by Douglas P. Hardy and driven by James M. Bryant and an automobile owned by Zachary Williams and driven by his son, John J. Williams, Jr., which occurred February 5, 1953 about 10:45 p. m., on U. S. Highway No. 15, approximately one and a half miles south or southwest of Lydia in Darlington County. Zachary Williams was riding with his son on the front seat of the automobile. His daughters, Mary Alice Williams and Janare Williams, for the alleged wrongful death of whom these actions were brought, were riding on the back seat. All four occupants of the automobile were apparently killed instantly in the collision.

Joined as defendants were Hardy, Bryant and the estates of Zachary and John J. Williams, Jr. It was alleged in each complaint that the death of the plaintiff's intestate was caused by the joint and concurrent negligent, reckless and wilful acts of all defendants. In addition to answering, defendant Hardy filed a cross-complaint against the Zachary Williams and John J. Williams estates, in which he sought to recover for personal injuries and the damage to his truck sustained in the collision. The two actions were tried together and resulted in a verdict in each case in favor of the plaintiff for $40,000.00 actual and $5,000.00 punitive damages against all defendants. The trial Judge granted a new trial unless the plaintiff in each action remitted on the record $10,000.00 actual damages. This was done and judgments entered accordingly. Hardy and Bryant have appealed.

The first question for determination is whether the Court below erred in refusing appellants' motion for a directed verdict upon the grounds (1) that there was no evidence of negligence on the part of appellants, and (2) that the physical facts showed that the collision was due solely to the negligence of John J. Williams, Jr., in driving to the left of the center of the highway.

Appellants were hauling 15,000 lbs. of produce from Pompano, Florida to Baltimore, Maryland. The collision occurred on a curve. The truck was proceeding in a northerly direction and the automobile in a southerly direction. The impact was at the left front of each vehicle, showing an almost head-on collision. The automobile was knocked or pushed back a distance of approximately 41 yards. Both vehicles came to rest in the southbound lane, or on the automobile's side of the road. The concrete portion of the highway was 18 feet wide with a five foot bituminous shoulder on each side. The truck was eight feet wide and the overall length of the tractor and trailer was approximately 45 feet. There is a dispute as to the weather conditions. Several of the respondents' witnesses testified that it was drizzling rain, while the witnesses for appellants stated positively that the weather was clear.

Leverne Woods, a witness for respondents, testified that about 10:30 on the night of the accident, as he stopped his car in Hartsville before entering U. S. Highway 15, he noticed two cars pass; that he then entered this highway and, driving 40 or 45 miles an hour, followed these two automobiles from Hartsville to the place of the accident, a distance of about eight miles; that he drove some 60 to 100 yards behind the car in front of him which traveled about the same distance behind the first car (the one later involved in the collision); that both vehicles ahead of him remained consistently on the right side of the highway; and that just before the accident he saw the lights of a truck coming around a curve in the opposite direction. He further testified:

"Q. Leverne, as I understand it, you saw this truck when it came around the curve? A. Yes, sir.

"Q. There is no question in your mind but what that truck was straddling the center of the road, coming down the highway, is that right? A. That's right.

"Q. And the truck continued on across the center line until it ran into the automobile? A. Yes, sir.

"Q. You never did see the automobile on the truck's side of the road at any time, did you? A. No, sir, I didn't.

"Q. As far as you could tell, the automobile was on its proper side of the road? A. Yes, sir.

"Q. And that picture there represents the situation as you saw it there that night, doesn't it? A. Yes, sir."

The mother of this witness, who was with him in the car, corroborated his testimony. She was positive that the automobile involved in the collision remained on the proper side of the highway and that the truck drove across the center into the automobile.

According to these two witnesses, they stopped their car but remained at the scene only three or four minutes due to the fact that Leverne's mother "got sick" and fainted after she looked in the automobile and found that all of the occupants were dead. They said that the car which traveled from Hartsville immediately in front of them, carrying an out of state license, stopped but left before they did.

Hardy was asleep in the bunk of the truck when the accident occurred. Bryant, the driver, who said that he approached the curve at a speed of about 45 miles an hour, gave the following version of the accident:

"Well, I was coming down 15, heading north, about two miles this side of Lydia and I approached this curve and I saw some lights coming, approximately a hundred feet in front of me, I saw this car was on my side of the highway. I hit my lights three times and I put on my brakes and at the same time I hit and after we hit, I didn't have no more control of the truck. We went from my side of

the road over to his side of the road and that was where it was stopped.

* * *

"Q. And being on the curve you could tell that this car was about a hundred feet away when you could tell that he was on your side of the road?

"A. Yes, sir.

* * *

"Q. In other words, you were wholly on your side of the road at the time the collision took place?

"A. Yes, sir."

It will be noted that Bryant's testimony as to the position of the vehicles immediately before the collision is in sharp conflict with that of Leverne Woods and his mother. This presented squarely an issue for the jury as to which vehicle was driving on the wrong side of the road.

We are asked, however, to reject the testimony of respondents' two witnesses above mentioned as contrary to the physical facts revealed by certain photographs of the scene made on the day following the accident. These photographs, offered in evidence by appellants, show markings on the pavement beginning about 18 inches east of the center line and continuing diagonally across the highway to a point where the truck and automobile stopped on the west side. Appellants' witnesses testified that these marks were made by the tires of the truck and not by those of the automobile. Under all the circumstances we cannot say as a matter of law that the facts mentioned conclusively show that the testimony of Leverne Woods and his mother is false. It was the province of the jury to pass upon the credibility of this and other testimony in the case.

The showing made here is no stronger than that presented in the recent case of *Scurry v. International Paper Co.*, S. C., 88 S. E. (2d) 256, where we refused to direct a verdict for the defendants upon the ground that the plaintiff's testimony was contrary to the physical facts. We there

quoted with approval the following from 20 Am. Jur., Evidence, Section 1183: "So frequently do unlooked-for results attend the meeting of interacting forces that courts should not indulge in arbitrary deductions from physical law and fact except where they appear to be so clear and irrefutable that no room is left for the entertainment, by reasonable minds, of any other."

We think the trial Judge was clearly correct in refusing appellants' motions for a directed verdict and for judgment *non obstante veredicto*. The views above expressed also dispose of the contention that the Court erred in not granting a motion for a new trial on the ground that the verdict was contrary to the greater weight of the evidence. This was a matter addressed to the discretion of the trial Judge.

■ We now turn to the exceptions relating to the admissibility of testimony. The first is that the Court erred in allowing respondents' witness Moore, a commercial photographer, "to interpret physical facts surrounding the collision." This witness examined and took pictures of the vehicles both before and after they were removed from the scene .The testimony in controversy is as follows:

"Q. Exhibit No. 2. Do I understand correctly that that picture was taken some short time after the accident that night? A. Yes, sir, probably thirty minutes.

"Q. And insofar as the truck is concerned, you say you took this picture? A. Yes, sir.

"Q. Was that truck a sleeper cab or was it just an ordinary tractor without a bunk in it? A. I believe it was a sleeper cab.

"Q. So that this is indicating a folding up or a terrific blow there towards the windshield, isn't that correct? A. That is true.

"Q. Does that indicate a buckling around the frame in through the tractor?

"Mr. Anderson: We object, Your Honor. The picture is indicative and speaks for itself. Mr. Moore is testifying

to the taking of the pictures and not as to the mechanism of the car or buckling or anything of that nature.

"The Court: I think he can explain the picture.

"Mr. Hope: This is cross examination.

"The Court: He was present at the time, he said—

"By Mr. Hope:

"Q. Approximately how far did the front of that tractor drive into the side of the automobile? A. You mean how far from the—

"Q. I mean actually went on in through the body. It shows that it is protruding in there but how far? A. I will say about three or four inches.

"Q. And the people that were killed were still in the car when the picture was taken? A. Yes, sir."

The principal question complained of is the one to which appellants' counsel objected but it was never answered. In answering the next question the witness was evidently testifying from knowledge gained from a personal examination of the vehicles. We find no error. The case of *Huggins v. Broom*, 189 S. C. 15, 199 S. E. 903, relied on by appellants, is clearly distinguishable. It was there held that a photographer who made pictures of the scene several days after a wreck should not be permitted to give his opinion as to how markings on the highway were made and what made them.

The next question relates to the exclusion of certain testimony by appellants' witness Dibble. After graduating in civil engineering, this witness was employed for a number of years by the Highway Department. He is now a "traffic consultant". He was not present on the night of the accident. His information was derived solely from a later examination of the locus and a study of certain photographs presented by appellants. From the knowledge thus gained he was asked his opinion "as to what happened on the night of February 5th in connection with this collision." Respondents' objection to this question was sustained. An objection was likewise sustained to a question

in which the witness was asked to give his opinion "as to what caused those marks on the highway and the scratches on the highway". We think the ruling of the Court in each instance was correct. *Huggins v. Broom, supra,* 189 S. C. 15, 199 S. E. 903.

It is also claimed that the Court erred in excluding a "plan sheet" made by the witness Dibble. The testimony relating thereto is as follows:

"Q. Mr. Dibble, did you make any measurements on this curve? A. I did, sir.

"Q. Would you tell us what they were, sir? A. As a base map, I obtained from the state highway Department, a plan sheet for this curve. From that, I measured the length of the curve and the general culture of marks which you could locate by which you could locate items and then located the accident from the information from the photographs available. That is shown in a different color on this plan sheet.

"Q. Have you located the different objects on each side of the highway on that plan sheet? A. Yes, sir.

"Mr. Floyd: Your Honor, we offer this plan sheet in evidence.

"Mr. Hope: We object, your Honor.

"The Court: Let me see it.

"Mr. Hope: And after your Honor has seen it, we will state the grounds of our objection.

"The Court: All right, sir. What is the basis of your objection?

"Mr. Hope: The basis for my objection insofar as this one is concerned, is that someone has presumed on the basis of a hypothetical question or by hypothetical facts or by conjecture or surmise to interpose upon there a matter that would have to be within the knowledge of individuals that saw it and not from the standpoint of information furnished and passed upon the hypothetical proposition. If it hadn't been marked, it would be a different problem, but he has got the thing marked in such a way that it would

show up representing the opinion of one individual and not the factual situation.

"The Court: What about that, Mr. Floyd?

"Mr. Floyd: Your Honor, Mr. Dibble is a traffic consultant and has in his opinion reconstructed what happened here.

"The Court: I don't care what kind of an expert he is, he can't do that.

"Mr. Hope: That is exactly the basis of our objection, your Honor.

"The Court: The objection is sustained upon the ground interposed by counsel.

"The Court: Mr. Floyd, you are getting into the realm of speculation sure enough. If you extend the rule as to expert testimony to permitting an expert to reconstruct what in his opinion happened at the time, you would absolutely under a rule of that kind, destroy eye witness testimony on both sides and something that the court—I certainly couldn't permit that testimony."

The plan sheet mentioned is not included in the record before us. We are, therefore, not advised as to exactly what it contained but if, as appellant's counsel state, it represented a reconstruction by this witness as to "what happened", we think it was properly excluded. That was a matter for the jury.

It is next contended that the Court erred in refusing to take judicial notice of the facts shown on a chart in a handbook published by the Highway Department which purports to show the minimum distances at which motor vehicles can be stopped at various rates of speed. Also shown on this chart is the distance at different speeds which a motor vehicle will cover before the driver, after seeing "danger", can apply his brakes, denominated thereon as "driver's thinking distance." The testimony with reference to this "Driver's Handbook" is as follows:

"Q. Do you have a South Carolina Driver's Handbook?

"A. Yes, sir.

"Q. Are you familiar with that handbook?

"A. Yes, sir.

"Mr. Floyd: We offer the handbook in evidence.

\* \* \*

"The Court: What is the purpose of offering the handbook?

"Mr. Floyd: Just laying the foundation for later testimony.

"The Court: I sustain the objection if you can't be any more definite than that, Mr. Floyd.

\* \* \*

"Mr. Anderson: \* \* \* At this time, I would like to ask the Court to take judicial notice of the thinking and braking, which are scientific facts, general facts and so forth.

"The Court: No, sir, I will not take judicial notice of it."

The record does not disclose the source of the facts stated on the chart appearing in the "Driver's Handbook", or the circumstances under which they were developed. No one was offered as a witness who had made a test of this nature. A chart somewhat similar to the one here involved will be found in Blashfield's Cyclopedia of Automobile Law and Practice, Permanent Edition, Volume 9 C, Section 6237, and it has been referred to in several decisions from other jurisdictions. While it is common knowledge that some interval necessarily elapses before the impulse to apply automobile brakes can be made effective, we cannot take judicial notice of the exact reaction time, nor can we take judicial notice of the precise distance in which a given motor vehicle traveling at a particular speed on a particular road can be stopped. See *Muse v. Page,* 125 Conn. 219, 4 A. (2d) 329. Of course, there are maximum limits that are matters of common knowledge. The chart was properly excluded.

The remaining exceptions relate to the amount of the verdict. It is claimed that the trial Judge erred in not granting a new trial upon the ground that the verdict was so grossly excessive as to indicate that it was the result of prejudice, caprice or passion, or other consid-

erations not founded on the evidence. Respondents' intestates lived at home with their parents and were 18 and 13 years of age, respectively. By granting a new trial *nisi,* the trial Judge reduced the verdict in each case to $30,000.00 actual damages and $5,000.00 punitive damages. We cannot say that he clearly abused his discretion in not reducing it further, nor are we warranted in saying that the jury was actuated by prejudice, caprice or passion. In the recent case of *Mock v. Atlantic Coast Line Railway Co.,* S. C., 87 S. E. (2d) 830, we held that the trial Judge was not guilty of an abuse of discretion in refusing to disturb a verdict of $50,000.00 actual damages and $15,000.00 punitive damages for the wrongful death of a twelve year old boy.

Judgment affirmed.

STUKES, TAYLOR and LEGGE, JJ., and JOSEPH R. MOSS, Acting Associate Justice, concur.