**Lloyd H. BOLSTAD et al., Appellants,**

v.

**Mrs. Vina EGLESON et al., Appellees.**

**No. 13059.**

Court of Civil Appeals of Texas.

Houston.

June 25, 1959.

Rehearing Denied July 16, 1959.

R. H. Singleton, Houston, Butler, Binion, Rice & Cook, Houston, of counsel, for appellants.

Albert P. Jones, Raymond L. McDermott, Houston, Helm, Jones, McDermott & Pletcher, Houston, of counsel, for appellees.

WOODRUFF, Justice.

This is a damage suit arising out of a collision occurring between two trucks in west Texas on the afternoon of May 27, 1952, wherein Joe D. Egleson was killed. Appellees, Vina Egleson, Shirley Jean Egleson and Joe D. Egleson, Jr., his widow and two minor children, and William W. Egleson, his father, brought this suit in the District Court of Harris County against Perforating Guns Atlas Corp., a corporation hereinafter called Atlas, and its employee, Lloyd H. Bolstad, appellants, to recover their damages occasioned by such collision. Highway Insurance Underwriters intervened to recover workmen's compensation benefits paid to Vina Egleson and the children as the result of Joe D. Egleson's death.

Appellees based their action upon the premise that Lloyd H. Bolstad, while operating the Atlas truck within the scope of his employment, was guilty of certain acts of negligence, each of which was a proximate cause of the collision. Appellants defended on the ground that the deceased Egleson, in driving the truck owned by Davis Transport, was guilty of acts of negligence proximately causing the collision.

The Trial Court overruled appellants' motion for an instructed verdict presented at the close of appellees' evidence and at the close of all the evidence.

Pursuant to the jury's verdict in which Bolstad was found guilty of four separate acts of negligence, each of which was found to be a proximate cause of the collision, and no act of contributory negligence on the part of Joe D. Egleson proximately causing the collision having been found, the Trial Court rendered judgment in appellees' and intervenor's behalf in the amount of their damages as found by the jury aggregating $75,000. From this judgment appellants have perfected this appeal.

By their First Point appellants assign as error the Trial Court's action in refusing to instruct a verdict in their behalf "because as a matter of law there was no evidence, or in the alternative insufficient evidence, of any negligence" on the part of the appellants which could have been the proximate cause of Joe Egleson's death.

In their reply brief appellants for the first time under the same point seek to expand their contention by arguing that the verdict finding appellant Bolstad guilty of negligence is so against the great and overwhelming preponderance of the evidence as to be manifestly wrong, thereby calling upon this Court to exercise its fact reviewing powers as contemplated by the Constitution of Texas, Article V, Sec. 6, Vernon's Ann.St., and Rules 451, 453, and 455, Texas Rules of Civil Procedure.

We are aware of the directive given to the Courts of Civil Appeals by our Supreme Court in In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, and implemented by the recent cases of Tudor v. Tudor, Tex., 314 S.W.2d 793, and Harrison v. Chesshir, Tex., 320 S.W.2d 814, enjoining the Courts of Civil Appeals when the issue is raised, to weigh and consider all of the evidence and to conclude as a question of fact whether or not the jury's verdict is so contrary to the great and overwhelming preponderance

of the evidence as to render it manifestly unjust.

■ However, we are of the opinion that appellants' point of error goes no further than to complain of the Trial Court's refusal to instruct a verdict for the reasons assigned that there was no evidence or no sufficient evidence to warrant the submission to the jury of any issue of appellants' negligence which was a proximate cause of the accident. This point of error relates only to a question of law. It does not go the further step and encompass the fact issue which would require consideration of the sufficiency of the evidence to support the verdict. Fry v. Dixie Motor Coach Corp., 142 Tex. 589, 180 S.W.2d 135, 137; Hall Music Company v. Robinson, Tex.Com.App., 117 Tex. 261, 1 S.W.2d 857; Electric Express & Baggage Company v. Ablon, 110 Tex. 235, 218 S.W. 1030, and especially the concurring opinion of Chief Justice Phillips; Ochoa v. Winerich Motor Sales Co., Tex.Com.App., 127 Tex. 542, 94 S.W.2d 416; Fambrough v. Wagley, 140 Tex. 577, 169 S.W.2d 478.

The term "insufficient evidence" has frequently been used in denoting the absence of the quantum of proof to warrant the submission of an issue to the jury, thus presenting a question of law. Seybold v. Johnson, Tex.Civ.App., 11 S.W.2d 399, 404, writ dism.; Radley v. Knepfly, 104 Tex. 130, 135 S.W. 111, 113; Robertson v. Magnolia Petroleum Co., Tex.Civ.App., 255 S.W. 223, 230, writ dism.; Webb v. Karsten, Tex.Civ.App., 308 S.W.2d 114, 116; Pair v. Caraway Drilling Co., Tex. Civ.App., 250 S.W.2d 292.

■ Since appellees failed to file a reply brief, we have been somewhat reluctant to decline to pass upon the insufficiency of the evidence to support the verdict though it was not presented by the point. However, as we view the admonition set forth by the Supreme Court in Releford v. Reserve Life Insurance Co., 154 Tex. 228, 276 S.W.2d 517, 518, the fact reviewing prerogative of this Court shall not be exercised unless it is invoked by a proper point of error. There it was said:

"We note that the Court of Civil Appeals said in its opinion that 'the answer of the jury to Issue No. 1 is "so against the great weight and preponderance of the evidence as to be clearly wrong" ', and that 'certainly there is not sufficient evidence in this record to support the judgment of the trial court.' We have carefully examined the points of error contained in appellant's brief in the Court of Civil Appeals and we find no point challenging the sufficiency of the evidence to support the jury's verdict. The court would have no authority to remand the cause on points of error raising only 'no evidence' questions. Hall Music Co. v. Robinson, 117 Tex. 261, 1 S.W.2d 857; Liberty Film Lines v. Porter, 136 Tex. 49, 146 S.W.2d 982."

■ As the appellants are contending that as a matter of law there was no evidence or alternatively insufficient evidence to warrant the submission to the jury of any act of negligence on the part of appellant Bolstad which could have been a proximate cause of the accident we must examine the record and determine whether there is evidence of probative value therein which, with the inferences that may be reasonably drawn therefrom, when viewed in the light most favorable to appellee, will support at least one of the findings of negligence proximately causing the accident. Biggers v. Continental Bus System, Tex., 303 S.W.2d 359; Hall v. Medical Building of Houston, 151 Tex. 425, 251 S.W.2d 497; Phoenix Refining Co. v. Powell, Tex.Civ. App., 251 S.W.2d 892, n. r. e.

The accident occurred in west Texas on May 27, 1952, between 2 and 3 p. m. on a straight blacktop highway known as Farm and Market Road 33 which was 18 feet wide with a white stripe in the center, running in an east and west direction

across sparsely settled, rolling country. At the time of the collision both trucks were going west. There were shoulders about 40 feet wide on each side of the highway. The hills were about one and a quarter miles apart. There were four pipe trucks, all owned and operated by Davis Transport, of the tractor-trailer type, in the convoy, each being 49 feet in length, loaded with 60 joints of 5½ inch pipe 27 to 30 feet long, with a gross weight of 47,000 to 50,000 pounds. The convoy had left Houston about 2 p. m. the day before. Its destination was in the vicinity of Big Lake, which was 25 to 30 miles west of the place of the collision. The drivers had slept 5 hours in Austin that night, and after reaching Mason they slept 2 or 3 hours more. At Eldorado, about 40 miles east of where the accident occurred, they had lunch. The deceased Egleson was one of the drivers. He appeared to be in good shape physically. Some few miles before the collision the other drivers, Wagley, Van Ostrand and Moore, had stopped to let Egleson pass because he had no jack in his truck. Shortly thereafter Wagley passed Egleson, leaving Van Ostrand and Moore in the third and fourth positions. Before the accident occurred, Egleson had been topping the hills about 30 to 35 miles per hour and rolling off of them about 45 miles per hour.

Though Bolstad testified he came from the west, the witness Carruthers, a rancher who lived about 200 feet south of the highway and about ¾ of a mile west of the place where the accident occurred, testified he saw the white pick-up truck with its headlights burning approach his house from the east and turn left into his driveway. This was some 20 minutes before the collision. It backed up and headed east. It was shown that it was the pick-up Bolstad was driving. It was loaded with 16 perforating guns, 10 feet long, each weighing about 150 pounds, which he was to deliver to a drilling rig on a Conoco lease south of the road. Bolstad testified he could see the rig, but this being his first trip to that vicinity he was experiencing difficulty in finding the road. As shown by Carruthers, it was some 500 feet west of Carruthers' house and was difficult to see from the highway. Bolstad, after leaving Carruthers' house, went east about 2½ to 3 miles on the highway and then decided to turn back. He made a U-turn, pulling off of the blacktop road, coming around as he headed west on the highway. He couldn't recall seeing an oilfield truck when he made the turn though "just a little up the highway" one passed him and went around on the left-hand side of the road. It was carrying pipe. That was about half a mile down the road from where he made the U-turn. After cresting the next hill and going about 100 feet or so, the accident happened. That was about 2½ miles from the place he had made the U-turn and about ½ to ¾ of a mile from the point he thought the road led off to the south. He was making about 30 to 35 miles per hour, traveling on the right-hand side of the highway. The pickup was a white "bobtail" with 2 axles, dual wheels on the rear and a wooden floor on the bed, metal sides about 2½ feet high, and a metal tailgate. It was equipped with a rearview mirror extending outside on the left-hand side. The last thing he remembered was right after he had gone over the crest of the hill a few feet, 100 feet approximately. He didn't look in the rearview mirror after passing the top of the hill. After starting down the slight incline, he didn't feel a jolt, didn't see anything behind him, didn't hear a horn or anything, and didn't remember anything after he went beyond 100 feet from the top of the hill. He stated he had a head injury which accounted for the loss of memory, and that he had heard retrograde amnesia mentioned.

The rancher, A. S. Carruthers, did not see the accident, but he heard it. He was seated on his front porch some 200 feet south of the highway and about 20 minutes before the accident he saw the Atlas truck headed west. It came over his cattle-guard, backed out and headed back east. Though it was possible for the driver to see the oil

rig to the south, he could not see the road leading to it. Carruthers heard the impact of the collision. It sounded like a blast of dynamite. He went immediately to the scene, arriving within 5 minutes after it occurred. He noted the two trucks that had stopped east of the wreck, and as he got out of his pick-up one of the drivers of those trucks approached him. At the wreck they found two dead men. They were Egleson and a passenger who was with appellant Bolstad. One man (Bolstad) was alive but unconscious. Carruthers used his pick-up to help pull pipe off of the highway. He also testified that a lot of the perforated short pipes from the Atlas truck were lying "in here" (which appears from the testimony to have been east of the place where the trucks came to rest) and some of it was across the fence on the north side of the highway. Three joints were "way out in the pasture." Carruthers and the two truck drivers were the only persons around for about 5 to 15 minutes. The two men in the Atlas truck had been thrown out of the left door and were lying on the ground on its left side. Bolstad was lying about 2 feet from the truck and the other man 2 or 3 feet from the other side of him. The driver's door was still open. He said it had rained about 11 o'clock that morning and the shoulders of the highway were "pretty muddy." However, at the time of the accident the pavement was dry. He looked at the Atlas truck and didn't see any damage whatever to the front end. He stayed at the scene about an hour and a half or two hours. He saw no skid or brake marks on the pavement except two skid marks about 12 to 16 inches long running "crossways" on the south side of the pavement. They were about 50 to 70 feet "behind" (uphill) where he saw steaming water on the pavement on the north side of the road where the accident occurred. He saw no marks on the shoulders of the highway above the place of the accident that would indicate a U-turn.

The witness, Vic Atwood, a highway patrolman who investigated the wreck, found skid marks on the right-hand side of the highway. The distance from the beginning of the skid marks back to the no-passing zone near the top of the hill was 80 steps, equivalent to 80 yards, and from this point to the top of the hill was 50 yards. Thus, from the beginning of the skid marks to the top of the hill was 130 yards or 390 feet. This witness also stated that most of the damage to the appellants' truck was on the rear left corner. He also said there were no skid marks on the left-hand side of the black-top road and that the skid marks closest to the center line on the north side were 17 inches from (north of) the center line. The skid marks on the road nearest the center line were 75 feet and 8 inches long, and after leaving the pavement they were 48 feet to the center of the wrecked vehicles.

According to the witness Roy Moore, the wrecked trucks came to rest some 200 yards below the crest of the hill and the skid marks on the right-hand side of the pavement were made by the trailer wheels of the deceased's truck. They led right up to the deceased's truck, and the next day while clearing away the wreckage they found the trailer brakes locked. It was necessary to bleed the air tank in order to unlock them.

It was also shown that with the load of 47,000 to 50,000 pounds it would take some 125 to 150 feet to stop the truck in an emergency going downgrade where the accident occurred at a speed of 35 miles per hour. The Davis and Atlas trucks were each 8 feet wide.

Wagley, who was ahead of Egleson, testified that about 2 or 3 miles east of the place where the accident occurred he had seen the defendants' white truck meeting him headed east with its headlights on. As it approached him, it made a U-turn right in front of him, some 150 to 200 yards, running onto both shoulders in mak-

ing the turn. Immediately after this Wagley pulled over to the left and passed the Atlas truck. At that time the white truck was going about 40 to 45 miles per hour. If anything had been blocking the south lane Wagley would have had to put on his brakes to avoid hitting the Atlas truck. Later Wagley noticed in his rearview mirror that the deceased's truck was following the Atlas truck and that the deceased did not attempt to pass it. The last view he had gotten of them, they were about 100 to 150 yards apart, both on the right-hand side of the highway. Some 8 or 10 miles farther the witness pulled off the road to wait for the convoy and was informed of the accident by someone who came along. He returned to the scene.

Van Ostrand, the driver of the third truck, stated he was behind the deceased about 300 to 400 yards at the time of the accident. He was going upgrade and the crest of the hill prevented his seeing it. The first he knew of it was when he saw the headlights of the Atlas truck at a distance of some 200 to 300 yards swing around to the left and then slide into the fence in a big cloud of dust, dirt and smoke, all on the right-hand side of the road. He then pulled his truck onto the shoulder of the road, not too close, and Moore pulled up beside him. They both ran to the wrecked vehicles. Both trucks were completely turned around, headed east. The pipe from the deceased's truck was scattered all over the highway and in the bar ditch for some 50 or 60 feet. The load of perforating pipe from the Atlas truck was thrown from the bed of the truck.

The fourth driver, Roy Moore, testified that at the time of the accident the weather was fair and the shoulders and pavement were dry. He had seen Egleson before the accident driving about 35 or 40 miles per hour. The first he knew of the accident was when he saw lights on the Atlas truck shining toward him and saw some dust and smoke. That was when he crested the hill. The wrecked vehicles were on the right-hand side of the pavement about 200

yards west of the crest of the hill and about 25 to 30 feet therefrom and next to the fence.

Inspecting the damage to the Egleson truck, he found that the flagpole on the right-hand side of the front bumper was knocked off. It "looked like" the bumper had been hit about a foot or a foot and one-half from its right end and that it had hit the rear wheel of the Atlas truck on the driver's side because there was red paint on the wheel and Egleson's bumper was painted red. He further stated: "It hit kind of on the rim," and also stated that the red paint on the rim and bumper "looked like it was the same paint." He found no "splintered or pushed in" damage to the rear of the Atlas truck. He saw skid marks on the pavement where "Egleson applied his trailer brakes." All marks were on the right-hand side and they led "right to where the truck turned over." Its wheels were knocked from under it and the frame hit the pavement. It cut two holes on the right-hand side of the pavement near the edge. There were no marks on the left-hand side of the highway.

This testimony is confirmed by numerous pictures which were placed in evidence. Several showed the skid marks on the pavement which led to the wreck. Briefly stated, they showed the white Atlas truck standing upright facing in an easterly direction. The left front fender appeared to be about 5 feet from a barbwire fence along the north line of the highway right of way, and its rear end touching the fence. Its hood was raised slightly, but there was no apparent damage to its front end. Adjacent to and somewhat under the right rear end of the bed lay the tractor of the Davis unit. It, too, faced east. All of its wheels were off and the motor rested on the ground. The cab was twisted and mashed down. It was toward the pavement from the motor. As Mr. Carruthers testified, it was almost entirely demolished. Immediately behind it was the trailer. It was turned over, with its rear end somewhat closer to the fence line than the cab. A mass of

pipe lay beneath the trailer bed, spread out toward the highway in a wide, fan-like pattern. The testimony showed, too, that some of it had been scattered across the paved portion of the highway. A picture taken north of the fence, facing south, showed the rear end of the bed of the Atlas pick-up resting on the ground. The right side of the rear end appeared to be several feet higher than the side next to the fence, obviously caused by the fact that the right side toward the rear was resting upon part of the Davis truck. This is confirmed by Carruthers' testimony. Its tailgate was down and there were no perforating guns in its bed. This exhibit (Appellees' No. 11) also showed that there were some marked splintering and separations in the 2 x 6 oak boards forming the bed of the pick-up. None of them, however, appeared to be missing. It likewise showed that a piece of channel iron across the rear end of the bed of the truck was "bowed outward" to the rear. It showed, too. that there was no damage to the back of the cab of the Atlas pick-up, and the witness Richardson, who took the pictures, so testified. Appellees' Exhibits 8 and 10 also showed the front wheels and axle of the Davis truck were some few feet east of its cab near the right door of the Atlas truck. The rear dual wheels and axle of the Atlas truck were also shown to be parallel to and near the wire fence, a short distance east of the pick-up.

Mr. Shannon, a witness for the appellants, who repaired the Atlas truck after the accident, said most of the damage was to the "left rear corner"; the rear wheels were "knocked out" from under it; the metal band that went around the bed was "bowed out"; and that "it was hit from the rear, the left rear." He also testified that the left rear cab post "was broke off" and the left rear fender was not mashed in toward the body. The bed was floored with 2 x 6 oak planks. The left-hand side of the floor had to be replaced, but none of the right-hand side. The frame was not bent, but was shoved forward, and the tailgate was "all bent up." The collision, so he testified, occurred to the left side and rear. He testified, too, that the shearing off of the rivets from the spring hangers on both sides indicated that the rear wheels were knocked out from under the truck by being moved forward.

Truck driver Van Ostrand testified that when he got down to the scene of the accident Egleson's truck was headed east, completely turned around. The Atlas truck was headed in the same direction. They were about 12 to 15 feet off the pavement. He made an inspection of them to find marks of damage on them. He testified that on the Davis truck there was a front bumper which, before the accident, had a "flagpole"—a piece of $1\frac{1}{4}''$ pipe sticking straight up about 2 feet high. The evidence showed that the bumper was painted red. In the wreck he found the bumper and the flagpole on the right-hand side. The flagpole on the right-hand side had been broken off but the one on the left was only bent. From his examination of the Atlas truck, which was painted white, it "looked like" to him that it was "on the lefthand corner, more to the side, than on the corner" where the Davis truck hit the Atlas truck. In describing its appearance he said it had a bent place on the left-hand side "and the rear wheels were knocked plumb out from under it." Its left door was bent but he didn't know what hit it. Also the tailgate was pulled out where it was fastened to the bottom, which he "figured" was caused by the perforated pipes "coming back so fast" and knocking it out. He also testified that something had dug a couple of holes right in the edge of the pavement on the right-hand side of the road. They were about 25 feet east of the place where the vehicles came to rest and on the right-hand side of the white line in the road. He also described skid marks curving off to the right and their finding the two men thrown from the pick-up, and the body of Joe Egleson about 12 feet from his truck closer to the pavement. He testified, too, that he had seen Joe Egleson in operating and driv-

ing trucks and "he was as good a driver" as he ever saw during his 30 years of experience in driving trucks. The proof showed, too, that Egleson had some 9 or 10 years experience in driving heavy equipment.

It was the appellants' contention that Bolstad was proceeding west in the Atlas truck at about 30 to 35 miles per hour on his right-hand side of the road when Egleson, approaching him from the rear at a greater speed, drove the right front part of the Davis Transport truck into the left rear end of the pick-up. The force of the impact, so they urged, rammed the right front of the Davis tractor somewhat under the left rear part of the pick-up, and caused the trucks to become so entangled that all of the equipment continued forward some distance and gradually moved to the right off of the pavement until eventually the Atlas truck pivoted and the Davis truck and trailer swung around to the rear and came to rest in the position as shown in the pictures offered in evidence, each truck having thrown out its load as it swung around.

Appellees contend that the evidence, when viewed most favorably to them, is sufficient to prove that Bolstad became confused when he had failed to find the road leading to the drilling rig south of the highway at the time that he turned around at Mr. Carruthers' house and started back east. That after having proceeded some 3 to 4 miles, he made a U-turn in front of Wagley's truck and started west again. When he had traveled about 2½ or 3 miles, he topped the hill and started down, with Egleson following some 75 to 100 yards, not having reached the top of the hill. At this point the rig was visible to Bolstad, as shown by the exhibit. He pulled to the shoulder and stopped momentarily to check his bearing.[1] Intent on his mission and having decided his course, he drove his truck at an angle onto the right-hand side of the highway immediately in front of Egleson's truck, which in the meantime had come over the hill and was traveling downgrade toward the Atlas pick-up which was stopped off of the blacktop. When he had reached a point in close proximity to the pick-up, it started up, moving toward the pavement. Egleson, seeing this precipitous movement of the Atlas truck and being unable with the weight of his loaded equipment to make a turn to his left, locked his trailer brakes in an effort to stop without sliding his pipe load forward into the cab. It was, however, too late to prevent the collision because the Atlas truck was by that time in an angular position on the north side of the blacktop.

In further support of their contentions, appellees offered the testimony of Dr. W. H. Tonn, Jr., who was a consulting engineer and an accident analyst with several years experience in that field. Based upon his study of the photographs of the accident, the physical facts, the depositions of the witnesses, Van Ostrand, Moore and Bolstad, which were admitted in evidence, and the blackboard diagrams which were drawn during the trial, he testified that it was his opinion that the accident was a side-angle collision. Directing attention to appellees' Exhibit 11, he said it showed that the Atlas truck was "bent by the direction of the force from the side out on the corner," and that the wooden floor had been "separated but had not been ruptured, or fractured, or torn up on the rear." "That is indication of contact with some other vehicle on the lefthand side to the

---

1. Appellants vigorously contend that Carruthers testified the shoulders were muddy. Moore, however, testified that the weather was fair and the shoulders and pavement were dry. Van Ostrand testified that after he saw the Atlas truck slide into the fence "in a big cloud of dust, dirt and smoke," he pulled his truck onto the shoulder of the road and Moore pulled up beside him. The jury was privileged to accept Moore's and Van Ostrand's testimony in accounting for there being no testimony regarding any tracks on the shoulders indicating that Bolstad had pulled off the highway.

rear of the Atlas truck," he said. With reference to the mental channel iron extending across the back of the pick-up, he called attention to the wooden flooring which was split in two "against it," and "bent out a little bit, but not dented in," nor was it "*severly* damaged." That indicated to him "that the force that did the damage * * * came from the front of the truck backward, not from the back forward." Testifying further, he said from his studies in other cases where there had been rear-end collisions with trucks having wooden floors, the beds were "completely disintegrated," and "the visible damage is extensive." Upon being shown appellants' Exhibit 1, a picture of the left side of the Atlas truck after the collision, he testified that it showed that the left-hand front side of its bed was "pushed up against the cab," its significance being that it was not "a rear end collision but a side angle collision on only the side of the truck. This side of the bed received the competent force which forced it forward. The other side didn't receive any component of force in that direction."

In response to a detailed examination by counsel, the witness gave his opinion of the movement of the trucks and trailer immediately after the collision assuming that the Davis truck was on its side of the highway with its left wheels some 17 inches from the center line. In substance, it was as follows: The Davis tractor, upon striking the left rear corner of the pick-up with its right front, including the bumper that "stuck out" 12 inches, started to jackknife to the right immediately on contact and continued forward in this fashion about the length of the trailer until the front end of the tractor was about 6 to 8 feet "or maybe a little farther" off of the right-hand or north edge of the pavement. The trailer, still traveling forward, then started rotating clockwise around the end of the tractor which was then being moved forward by the heavy weight (approximated at 44,000 pounds) of the pipe, which became the controlling factor. After leaving the pavement, the trailer finally swung out toward the north, its rear wheels never coming· across the center of the road, and continued its rotation clockwise around the tractor which then faced east. The trailer in the meantime having discharged the greater portion of its load, turned over and came to rest near the highway fence on the north and behind the tractor.

With reference to the Atlas truck, Dr. Tonn testified that in his opinion it was struck at the left rear of the bed near the left wheel at an angle of approximately 45 degrees. In part he based his opinion on the fact that the bumper on the front of the Davis truck left red paint on the rim of the left rear wheel of the Atlas truck; the breaking off of the flagpole on the right-hand side of the bumper; and the direction of force that sheared the spring bolts from the body of the Atlas truck on both sides. It was his further opinion that upon impact the force applied to the left rear corner of the Atlas pick-up started it into a counter-clockwise movement as it moved off of the pavement in a "sideways direction" ahead of the Davis truck, throwing pieces of the perforated pipe from its bed as it continued to rotate counter-clockwise and to move in the direction of the fence north of the highway. Finally, after losing its rear wheels and axle which had been sheared from the bed of the pick-up, and hurling out its load, some of the joints going through the fence and into the pasture to the north, it completed its gyrations with a swing to the left and came to rest in an upright position facing in an easterly direction a few feet south of the fence after the right rear of its bed had collided with the left front end of the Davis tractor which had then reached a point slightly closer to the highway than the Atlas pick-up. When it stopped the inertia of their bodies threw Bolstad and his passenger against the left door and out of the pick-up, thus accounting for the place where they were found north of the truck.

On cross-examination, Dr. Tonn testified that assuming the Davis truck with a gross weight of 44,000 pounds was coming down the hill at 35 miles per hour, and taking into consideration reaction time of ¾ of a second, it would have taken "somewhere around 125 to 150 feet" to stop the truck, with the possibility that the pipe would have "shifted over" under those conditions.

In response to special issues submitted, the jury found: (1) that Bolstad failed to maintain a proper lookout; (2) that such failure was a proximate cause; (3) that Bolstad turned toward the left immediately before the collision, and (4) that he failed to signal such intention; (5) that such failure was a proximate cause; (6) that Bolstad failed to maintain proper control of the truck; (7) that such failure was a proximate cause; (8) that Bolstad moved left upon the highway; (9) that such movement was when it could not be made safely; and (10) that such movement to the left was a proximate cause. As mentioned before, these findings established four separate grounds of negligence on the part of appellant Bolstad, each of which was a proximate cause of Joe D. Egleson's death, any one of which would be sufficient to entitle appellees to a recovery.

Appellants contend Dr. Tonn's testimony was inadmissible. Without it, they say appellees' proof was wholly insufficient to warrant the submission of any of the special issues to the jury. They say, too, that appellees' counsel repudiated Dr. Tonn's testimony in his jury argument and consequently they cannot rely on it. These contentions will be discussed separately under appellants' Points Two and Four, respectively.

█ We have gone into greater detail in setting forth the testimony than would ordinarily be justified. We have done so, however, because in the former suit appellant Bolstad was awarded a recovery against Davis Transport, Inc., for his injuries occasioned by this collision. That suit, however, is neither a bar nor an estop-pel to the appellees who were complete strangers thereto. Maryland Casualty Co. v. Morris, Tex.Civ.App., 128 S.W.2d 86. Moreover, though several witnesses appear to have testified in both trials, it does not necessarily follow that the same facts were developed by their testimony. Also, there were other witnesses who did not testify on the prior trial, one of whom was Dr. Tonn. Nevertheless, we must consider the evidence as it is in this record.

It is clear that appellant Bolstad had no recollection of the events which occurred after he passed beyond 100 feet from the top of the hill. He so testified. Appellants as well as the appellees, therefore, were without any eyewitness testimony in respect to what occurred between that point and the point where the highway patrolman Atwood testified the skid marks began 130 yards (390 feet) from the top of the hill. The intervening distance was approximately 290 feet.

In support of their contention that there was no testimony, or insufficient testimony, to raise any issue of negligence on the part of Bolstad which was a proximate cause of the accident, appellants cite Texas & P. Ry. Co. v. Shoemake, 98 Tex. 451, 84 S.W. 1049, and Comet Motor Freight Lines v. Holmes, Tex.Civ.App., 203 S.W.2d 233, n. r. e. In the first case, the mangled bodies of two brothers were found one morning strewn along a railroad track after several trains had passed. There was no proof as to what the young men were doing on the track, their positions or how long they had been there when they were struck. In the latter case, it was contended that the deceased was struck by the first truck in a convoy of three. At the trial no witness testified that the truck struck the deceased. To the contrary, the drivers of the first and second trucks, who were in a position to have seen the event if it had occurred, testified that they did not see the truck strike the deceased. Since there was no evidence, circumstantial or otherwise, to account for the manner in which the men met their deaths, the

judgment in each case awarding a recovery was reversed and rendered for the defendants.

Appellants also rely on Rounsaville v. Bullard, 154 Tex. 260, 276 S.W.2d 791; Schumacher v. Missouri-Pacific Transport Co., Tex.Civ.App., 116 S.W.2d 1136; and Wells v. Texas Pacific Coal & Oil, Tex. Com.App., 140 Tex. 2, 164 S.W.2d 660. These cases, too, are clearly distinguishable. In each instance eyewitnesses testified as to the manner in which the event occurred and their testimony was supported by the physical facts. Such proof, so it was held, would refute a theory of the facts which was inconsistent therewith.

It is obvious that those holdings are not applicable to the instant case where all parties rely on circumstantial evidence.

We know of no clearer discussion of the law on this subject than that by our late Chief Justice Gannon in Davis Transport v. Bolstad, Tex.Civ.App., 295 S.W.2d 941, 947, wherein it was said:

"Defendant says its motion for an instructed verdict should have been granted because the evidence shows no more than the occurrence of an accident which of course raises no presumption of negligence on the part of anyone. Cited in support of this proposition are Rankin v. Nash-Texas Co., 129 Tex. 396, 105 S.W.2d 195; Dixon v. Burling, Tex.Civ.App., 277 S.W.2d 957; Conner v. Chatman, Tex.Civ. App., 272 S.W.2d 136. These cases correctly state the law, but we do not consider them applicable to the facts of this case. Negligence, like any other ultimate fact, may be established by circumstantial evidence. See Texas Employers Ins. Ass'n v. Texas Compress Co., Tex.Civ.App., 284 S.W.2d 922, and cases therein cited. Of course, where the evidence is so evenly balanced that reasonable minds could not legitimately infer negligence as more probable from the circumstances established than its absence, plaintiff fails to meet his burden of proof. Davis v. Castile, Tex.Com. App., 257 S.W. 870; Comet Motor Freight Lines v. Holmes, Tex.Civ. App., 175 S.W.2d 464. * * * The true rule in negligence cases, as we apprehend it to be, is that where the circumstances are such that reasonable minds may logically draw either an inference of actionable negligence or its absence, the issue is one of fact for the jury and not one of law for the court. Where circumstantial evidence is relied on, only when the evidence is so evenly balanced that it permits only of speculation, surmise and suspicion, does plaintiff fail to make a case to go to the jury."

Unless it can be said that the evidence in this case will warrant only the conclusion that Bolstad was struck by the Davis truck as the pick-up was proceeding west in a normal manner on the highway, the decision of Le Sage v. Smith, Tex.Civ.App., 145 S.W.2d 308, cited by appellants, is also inapplicable. In that case it was held that where an automobile was being driven down the highway, the wife of the driver was under no duty to keep a proper lookout for automobiles approaching from the rear unless there appears some particular fact that calls the attention of the driver of the front car to the car that follows, or unless he slows down his vehicle. That such duty does exist under certain circumstances is recognized in Valley Film Service v. Cruz, Tex.Civ.App., 173 S.W.2d 952, 953, where it is said: "It is only in the event that he wishes to stop or change his course that he is required to signal to those approaching from the rear and to see to it that such stopping or change of course may be done in safety."

The proper application of the rule is aptly demonstrated in Langham v. Talbott, Tex.Civ.App., 211 S.W.2d 987, where it was held that since there was evidence that the car ahead had materially reduced

his speed or attempted to stop on the highway, it was error to fail to submit to the jury the issue of his failure to keep a proper lookout for vehicles to his rear.

After careful consideration, we are of the opinion the evidence was sufficient to raise at least the three ultimate issues and their respective causation issues which were submitted to the jury concerning Bolstad's failure to maintain a proper lookout; his turning toward the left immediately before the collision without giving a signal; and his moving to the left upon the highway at such time when he could not safely do so. We believe, too, after reviewing all of the evidence, that the rule against basing one inference upon another is not tenable. Phoenix Refining Co. v. Powell, Tex.Civ.App., 251 S.W.2d 892, and the excerpt quoted therein from Wigmore on Evidence (3rd Edition), p. 434, Sec. 41; Ft. Worth & D. C. Ry. Co. v. Burton, Tex.Civ.App., 158 S.W.2d 601; Straus-Bodenheimer v. Marshall, Tex.Civ. App., 91 S.W.2d 865; Bock v. Fellman Dry Goods Co., Tex.Com.App., 212 S.W. 635; Younger Brothers v. Marino, Tex. Civ.App., 198 S.W.2d 109.

As above stated by point Two, appellants contend that the Court erred in permitting Dr. Tonn to testify to his opinion of the manner in which the collision occurred for the reasons that he was not qualified; that his opinion was based on incompetent evidence; that it was speculative and conjectural; and that it invaded the province of the jury.

In tendering his testimony, appellees showed that Dr. Tonn was 37 years of age. From the University of Texas he had received the degrees of Bachelor of Science, Master of Science and Doctor of Philosophy. He had practiced as a consulting engineer for four years, and since 1948 he had worked independently. As additional academic experience he had served as the Assistant Director of Research on a project at M.I.T. at Cambridge where he tested materials for the Army and Navy. He had taught Chemical Engineering at the University of Oklahoma and University of Houston, and had done industrial work as a consulting engineer for various companies, including that of chief engineer with Rohm & Hass, and title research technologist with Shell Oil Company. His work since 1948 as an independent consulting engineer included accident analysis, which meant the reconstruction of an accident from known physical facts and the application of scientific principles. He testified that about 60% of his work concerned the field of accident analysis and that in 1955, the year before the trial, he had handled about sixty accident analyses. Based upon science and physics he was able, when given sufficient facts, to reconstruct and analyze an accident.

In addition to the foregoing, he testified he belonged to a number of recognized engineering and scientific societies, including the Professional Engineering Lines for the State of Texas; the American Institute of Chemical Engineers; the American Chemical Society; the American Men of Science; and Who's Who in Engineering. Moreover, he stated that he had written approximately thirty to forty scientific articles for technical journals and that during the past three years he had actual experience in the study of skid marks to determine stopping distances, and had made his own experiments, including a determination of speeds of vehicles from skid marks. In addition, he had studied charts compiled by others on these subjects.

In his work as a consulting engineer and accident analyst on many occasions he had been called upon to study photographs of physical damage. Frequently he had done his own photographic work. For the last three or four years on each occasion that he had been retained as an accident analyst, his work included the reconstruction of an accident from photographs which involved his taking into consideration known laws of physics and vectors of force.

Dr. Tonn explained some of these laws of physics and their application. He testified that he had been retained several months before the trial to make a complete study of the photographs introduced in evidence by the appellees and that he had done so. After being questioned about facts which he took into consideration in arriving at his opinions, he pointed out important physical facts revealed in the photographs which he had taken into consideration. His attention also was called to a blackboard diagram drawn by the witness Carruthers and after the physical facts were recounted, Dr. Tonn was asked to state the facts from the diagram upon which he could base an opinion as to a reconstruction of the accident. Too, in the interrogation the physical damage to the vehicles, marks on the road and shoulders as shown by the deposition testimony of Moore and Van Ostrand were restated to Dr. Tonn, and he commented on the importance of each of these items and explained why he took them into consideration in arriving at his opinion.

It was after this predicate had been laid when Dr. Tonn over appellants' objections gave his opinion, as heretofore set forth in the discussion of Point One, of the manner in which the accident occurred and reviewed the physical facts upon which he based it.

It is for the Trial Court to determine if the proposed witness has had sufficient opportunity for observation and experience in line with the subject under inquiry to entitle him to give his opinion based upon evidence adduced. When the Trial Court, in the exercise of his sound discretion, has determined this matter, the appellate courts will not disturb that decision in the absence of an abuse of that discretion. Montgomery Ward & Co. v. Levy, Tex.Civ.App., 136 S.W.2d 663.

Appellants rely upon Carroll v. Magnolia Petroleum Co., 5 Cir., 223 F.2d 657, and Smith v. Hardy, 228 S.C. 112, 88 S.E.2d 865, 869. These cases, in our opinion, are clearly distinguishable in that the witness in each case in offering his conclusion assumed facts which were contrary to testimony of on-the-scene witnesses. Moreover, in the latter case the Trial Court refused to permit the witness to testify "as to what happened" by information derived solely from his later examination of the locus, and a study of certain photographs. The admissibility of this testimony was subject to the discretion of the Trial Court.

In our opinion, the testimony of appellees' expert, Dr. Tonn, is within the proper limitations of opinion testimony under the facts of this case. Phoenix Refining Co. v. Powell, Tex.Civ.App., 251 S.W.2d 892, and cases there cited.

 Appellants in Point Three say the Trial Court erred in admitting the testimony of the witness Van Ostrand as to the ability of the deceased Joe D. Egleson to operate his truck because it was mere speculation and conclusion and invaded the jury's province.

The record shows that appellees offered the deposition of E. D. Van Ostrand that the deceased Egleson was as good a driver as he ever saw; that he was a careful driver at all times; and that based on his (Van Ostrand's) experience as a truck driver, Egleson was as good a truck driver as he ever saw.

Appellees suggest that this testimony was offered without objection. We have examined the record and conclude that though no formal objection appears to have been levelled at the time it was offered, it is apparent that there was some conversation at the Bench which was not set forth in the record. Some fifty pages later it appears an objection that such testimony constituted a conclusion and opinion of the witness, coupled with a motion to strike, was dictated into the record in the presence of the Trial Court. However, it further appears that the Trial Court qualified appellants' bill by stating that when the testimony was tendered its proffer was limit-

ed to whatever bearing it might have upon the deceased's wage-earning ability at the time of his death, and that appellant failed to request such instruction. Appellants thereupon requested that the jury be so instructed and the record reflects that the Court stated that the instruction would be given. No contention is made that it was not so given.

Nevertheless, it appears that the witness C. G. Richardson, the president of Davis Transport, Egleson's employer, testified to substantially the same facts when without objection he stated that from his observation over a period of four years or more the deceased handled his truck excellently; that he obeyed the rules and regulations of the company; and that he had never known him to violate any speed limit or take any chances he shouldn't take. It appears to be settled that objections to evidence are unavailing when similar evidence to the same effect is offered and received without objection. Lubbock Bus Co. v. Pearson, Tex.Civ.App., 277 S.W.2d 186, ref., n. r. e.; Rowe v. Liles, Tex.Civ.App., 226 S. W.2d 253, writ ref.

In our opinion the deceased's competency and skill as a truck driver was also put in issue by appellants' counsel in his cross-examination of C. G. Richardson, by developing that Egleson was driving the smallest truck of the convoy and inquiring of the employer whether he "had not yet been promoted" to the larger trucks; whether he had worked irregularly for Davis Transports during the last four years and "moved around from company to company"; and eliciting from the witness that shortly before this accident Mr. Egleson had had another accident with one of his trucks. Appellants having raised this issue, the above mentioned testimony of Van Ostrand, who was shown to have been a qualified truck driver with some 30 years of driving experience, was clearly admissible. Riley v. Fisher, Tex.Civ.App., 146 S.W. 581, writ ref.

Appellants in Point Four assert that the Trial Court erred in overruling their motion for mistrial because appellees' counsel told the jury to answer the special issues favorable to them regardless of the evidence and sought to instruct the jury as to the applicable laws, which was so prejudicial to appellants' rights as to warrant a mistrial.

As noted in the discussion of Point One, appellants also contend that appellees' counsel repudiated Dr. Tonn's testimony and without it appellees' evidence was so lacking in its sufficiency that it would not warrant the submission of any issue to the jury.

Appellees, in response to such contentions, say that appellants have failed to bring forward the alleged improper arguments in such manner that they may be considered for the reason that there are no bills of exception setting forth any such arguments or the Trial Court's ruling thereon.

However, appellants have caused to be filed under a separate cover with the Clerk of this Court a transcription of appellees' counsel's argument to the jury. Both the Court Reporter and the Trial Judge certified that it contained a true copy of the argument.

Appellees have moved to strike this transcription from the record because in the absence of any agreement of counsel, arguments to the jury are not a proper part of the statement of facts, nor can they constitute a bill of exception under the provisions of Rules 371, 372 and 377, T.R.C.P. Appellants tacitly concede that if the copy were certified by the Court Reporter alone it could not be considered. However, they say that since it has been certified by the Trial Court also, it should be treated as a part of the record. In support of this reasoning they cite Hartford Accident & Indemnity Co. v. Ethridge, Tex.Civ.App., 149 S. W.2d 1040 and Associated Employers' Lloyds v. Wynn, Tex.Civ.App., 230 S.W.2d 838, 839. Though it is true that in each of these cases holding the copies of the argument could not be considered the Trial Judge did not join in the certification of the

Court Reporter's transcription of the arguments, there is nothing contained in the opinions which would indicate that the rulings would have been otherwise if the Trial Judge had joined in the certification.

In Associated Employers' Lloyds **v.** Wynn, supra, it is said:

"The complained of argument is not shown by a bill of exceptions. It has often been held that in the absence of a bill of exceptions the appellate court will not pass upon the arguments or remarks * * * This is for the reason that the arguments do not ordinarily appear in the record unless preserved in a bill of exceptions duly authenticated by the trial judge, filed, and brought forward in the transcript."

The Supreme Court in Smith v. United Gas Pipe Line Co., 149 Tex. 69, 228 S.W.2d 139, 143, held:

"We further consider, as stated, that despite Rule 372(c) the proper way to preserve objections to improper argument is by bill of exception rather than bringing up the Court reporter's record of the argument as a part of or supplement to the statement of facts described in Rule 371, unless counsel agree to the latter method."

Any indefiniteness in the rule has now been set to rest in a recent ruling by the Supreme Court in Pritchett v. Highway Ins. Und., 309 S.W.2d 46, 50, where it was said:

"The complaint as to the argument was not preserved in the proper way, that is, by a bill of exceptions. While the correctness of the excerpts from the court reporter's notes was not challenged, this is not tantamount to an agreement on the part of opposing counsel to bring forward for review the objections to the argument by any other method. Only when the complaining party has presented the matter in a bill of exceptions is the opportunity afforded to his adversary and to the court for the addition of an appropriate qualification that might render harmless argument that otherwise would be improper or prejudicial. This rule has been almost unanimously adhered to. Smith v. United Gas Pipe Line Co., 149 Tex. 69, 228 S.W.2d 139; Hartford Accident & Ind. Co. v. Ethridge, Tex.Civ.App., 149 S.W.2d 1040; Associated Employers Lloyds v. Wynn, Tex.Civ.App., 230 S.W.2d 838; Hayter Lumber Co. v. Winder, Tex.Civ.App., 295 S.W.2d 730."

Inasmuch as the arguments of counsel do not constitute a part of the record, we believe that the same reasoning would apply to appellants' contention that appellees' counsel repudiated Dr. Tonn's testimony in his closing remarks to the jury when he argued that Dr. Tonn was wrong in his opinion regarding the positions of the trucks on the highway when the collision occurred. Nevertheless, if the point had been properly raised and presented counsel's comments amounted to no more than his deductions which had been made from the physical facts, and the jury was privileged to follow Dr. Tonn's opinion testimony instead of counsel's argument if to them it seemed more probable in the light of the facts. It is settled that a party is not necessarily bound to a fact which he admits only by way of opinion. Petit v. Klinke, 152 Tex. 142, 254 S.W.2d 769; DeWinne v. Allen, 154 Tex. 316, 277 S.W.2d 95. We see no reason why the same rule would not apply to his counsel in making a jury argument.

In our opinion appellees' motion to strike from the record the transcript of the jury argument is well taken and it is so ordered.

All of appellants' points are overruled and the judgment of the Trial Court is affirmed.