Opinion issued February 12, 2009


 











In The

Court of Appeals

For The

First District of Texas






NO. 01-06-01177-CV






KIMBLE LYNETTE LINCOLN, INDIVIDUALLY, AND AS
REPRESENTATIVE OF THE ESTATE OF BRIAN GREGORY, JR.,
Appellant


V.


CLARK FREIGHT LINES, INC. AND JUAN MANUEL VASQUEZ,
Appellees






On Appeal from the 190th District Court

Harris County, Texas

Trial Court Cause No. 2004-58847






O P I N I O N


 In this negligence suit, appellant, Kimble Lynette Lincoln, Individually, and
as Representative of the Estate of Brian Gregory, Jr. ("Lincoln") appeals the jury's
verdict in favor of the appellees, Clark Freight Lines, Inc. and Juan Manuel Vasquez. 
In four issues, Lincoln argues that (1) the trial court abused its discretion when it
allowed an expert to testify regarding an accident reconstruction that was
substantially dissimilar to the actual collision; (2) the trial court abused its discretion
when it allowed an expert to testify regarding an accident reconstruction that did not
meet the reliability standards outlined in Daubert (1) and Robinson; (2) (3) the trial court
abused its discretion when it allowed the jury to hear an expert's opinion that was
unreliable; and (4) the trial court improperly denied a motion for mistrial when the
verdict did not comport with the jurors' statements.

 We affirm.

Background


 On October 9, 2004, Brian Gregory, Jr. was driving with his father, Brian
Gregory, Sr., as a passenger in a 1989 Mustang. They stopped at a stop light at the
intersection of the Westbound Service Road of the Sam Houston Parkway and the
Northbound Service Road of the Hardy Toll Road ("Intersection A"). When the light
turned green, Gregory, Sr., who was traveling west on the Service Road of the Sam
Houston Parkway, drove toward the next light. At the intersection of the Southbound
Service Road of the Hardy Toll Road and the Westbound Service Road of the Sam
Houston parkway ("Intersection B"), the Mustang collided with a tractor-trailer
driven by Juan Manuel Vasquez and owned and operated by Clark Freight Lines.
Gregory, Jr. was killed.

 Lincoln, Gregory, Jr.'s mother, sued Vasquez and Clark Freight Lines for
negligence. She later amended her petition to include causes of action for negligence,
gross negligence, violations of the Texas Wrongful Death Statute and Texas Survival
Statute, principal-agent liability and negligent hiring, training and supervision.

 Lincoln filed a Daubert motion to prevent Deputy D. Pearson, an accident
reconstructionist with Harris County, from testifying about his accident
reconstruction. At the pretrial Daubert hearing, Deputy Pearson (3) testified that he is
assigned to the traffic enforcement division as an accident reconstructionist in the
fatality accident reconstruction team. He has worked in this capacity for 23 years,
attended several schools for accident reconstruction starting in 1988, and has over a
thousand hours in accident reconstruction training. He testified that, using various
tests, he could determine who proceeded through the red light at Intersection B, but
to determine who caused the accident he would need to determine the coefficient of
friction. Deputy Pearson testified that the coefficient of friction is a vehicle's
"resistance to the tires sliding on a roadway surface once the vehicle's tires are locked
and the vehicle is sliding on a level surface." He restated that "it's the deceleration
rate for a vehicle, at what rate that vehicle will slow down, given the fact that the
wheels are locked and sliding on a roadway surface." The trial court ruled that
Deputy Pearson could testify about the coefficient of friction of the tires and
causation. 

 At trial, Deputy Pearson testified, on the basis of the coefficient of friction, the
time it took Gregory, Sr.'s vehicle to stop after application of the brakes locked the
tires, and the timing of the lights, that Gregory, Sr. entered Intersection B on a red
light and caused the accident. Lincoln's accident reconstruction expert, Richard
Schlueter, testified on the basis of a similar coefficient of friction, the time it took
Gregory, Sr. to stop, and the timing of the lights, that Vasquez entered Intersection
B on a red light and caused the accident. The difference in their ultimate conclusions
derived from conflicting testimony as to how soon Gregory, Sr. sped forward after his
light at Intersection A turned green. Deputy Pearson testified that eyewitnesses said
the Mustang took off as soon as the light turned green. Gregory, Sr. testified that,
once the light turned green, he did not accelerate right away. He testified that
Gregory, Jr. told him that the light was green and then he accelerated.

 Deputy R. Swango corroborated Deputy Pearson's testimony. Deputy Swango
testified that he had over 700 hours of accident reconstruction training. He talked to
two eyewitnesses, both of whom stated that the Mustang took off right away once the
light at Intersection A turned green. He also testified that the Mustang could have
taken off in less than a half second. 

 The jury found that the negligence of Gregory, Sr. was the sole proximate
cause of the occurrence in question, and the trial court entered judgment that Lincoln
take nothing. Lincoln filed a motion for new trial, which the trial court denied.

Waiver


 In this appeal, Lincoln argues that Deputy Pearson's coefficient of friction and
causation testimony does not survive the Daubert-Robinson test for reliable expert
testimony because his testimony was "based on an unreliable methodology, which
drew conclusions from no scientific testing and only subjective 'eyeballing' of the
tires." Appellees respond that the issue of the reliability of Deputy Pearson's expert
testimony was waived because, after the trial court overruled Lincoln's Daubert
objection, Lincoln called Deputy Pearson to testify without objection. 

 We disagree that Lincoln's complaints have been waived. When Lincoln's
counsel called Deputy Pearson as a witness, counsel specifically stated, "Your Honor,
subject to the Court's prior rulings and without waiving the objection, we would call
to the stand Deputy David Pearson." At this point in time, the trial court had already
ruled that Deputy Pearson could opine on his coefficient of friction numbers and
causation. Thus, we conclude that, by calling Deputy Pearson, Lincoln did not waive
her objection to complain of the Daubert rulings on appeal. 

Expert Testimony


 In issues one through three, Lincoln argues that Deputy Pearson's coefficient
of friction analysis does not survive Daubert-Robinson because his testimony was
"based on an unreliable methodology, which drew conclusions from no scientific
testing and only subjective 'eyeballing' of the tires." Appellees respond that Deputy
Pearson presented a sufficient basis to show that his testimony was reliable.

 Texas has a long history of allowing qualified accident reconstruction experts
to testify regarding the way in which an accident occurred. See, e.g., Chavers v.
State, 991 S.W.2d 457, 460-61 (Tex. App.--Houston [1st Dist.] 1999, pet. ref'd);
Waring v. Wommack, 945 S.W.2d 889, 893 (Tex. App.--Austin 1997, no writ);
Trailways, Inc. v. Clark, 794 S.W.2d 479, 483 (Tex. App.--Corpus Christi 1990, writ
denied); DeLeon v. Louder, 743 S.W.2d 357, 359 (Tex. App.--Amarillo 1987), writ
denied per curiam, 754 S.W.2d 148 (Tex. 1988); Bolstad v. Egleson, 326 S.W.2d
506, 519 (Tex. Civ. App.--Houston 1959, writ ref'd n.r.e.). 

 Upon objection by the opponent of the evidence, the proponent of expert
testimony has the burden to prove that the evidence is admissible. E.I. du Pont de
Nemours & Co. v. Robinson, 923 S.W.2d 549, 557 (Tex. 1995). A two-part test
governs whether expert testimony is admissible: (1) the expert must be qualified and
(2) the testimony must be relevant and be based on a reliable foundation. Helena
Chem. Co. v. Wilkins, 47 S.W.3d 486, 499 (Tex. 2001). "Expert witnesses can have
an extremely prejudicial impact on the jury, in part because of the way in which the
jury perceives a witness labeled as an expert." Robinson, 923 S.W.2d at 553. The
trial court is required to assess the reliability--not the truth or falsity--of the expert's
opinion. Id. at 558. The testimony must be shown to be reliable before it is admitted. 
Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 726 (Tex. 1998). That
an expert is qualified does not mean that an opinion given by the expert is reliable. 
Robinson, 923 S.W.2d at 558. An expert "may be very believable but his or her
conclusions may be based upon unreliable methodology." Id. The criteria for
assessing reliability vary depending on the type of expert and the nature of the
evidence. Gammill, 972 S.W.2d at 726-27; see also Kumho Tire Co. v. Carmichael,
526 U.S. 137, 150, 119 S. Ct. 1167, 1175 (1999). There must not be too great an
analytical gap between the data or observations and the expert's conclusions. Gen.
Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S. Ct. 512, 519 (1997); Volkswagen of
Am., Inc. v. Ramirez, 159 S.W.3d 897, 904-05 (Tex. 2004). "Scientific evidence
which is not grounded 'in the methods and procedures of science' is no more than a
'subjective belief or unsupported speculation.'" Gammill, 972 S.W.2d at 720
(quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 590, 113 S. Ct. 2786,
2795 (1993)). 

 Unreliable scientific or technical evidence is of no assistance to the jury, and
is therefore inadmissible under Rule 702 of the Texas Rules of Evidence. Gammill,
972 S.W.2d at 720. The trial court may consider many factors in making the
determination of admissibility under Rule 702. Robinson, 923 S.W.2d at 557. These
factors include, but are not limited to: (1) the extent to which the theory has been or
can be tested; (2) the extent to which the technique relies upon the subjective
interpretation of the expert; (3) whether the theory has been subjected to peer review
and/or publication; (4) the technique's potential rate of error; (5) whether the
underlying theory or technique has been generally accepted as valid by the relevant
scientific community; and (6) the non-judicial uses which have been made of the
theory or technique. Id. at 557. If an expert relies upon unreliable foundational data,
any opinion drawn from that data is likewise unreliable. Merrell Dow Pharm., Inc.
v. Havner, 953 S.W.2d 706, 714 (Tex. 1997). Furthermore, an expert's testimony is
unreliable even when the underlying data is sound if the expert's methodology is
flawed. Id.

 When an experiment is conducted out-of-court and in the absence of opposing
counsel, there must be a substantial similarity between the conditions existing at the
time of the experiment and the actual event that is the subject of litigation. Fort
Worth & Denver Ry. Co. v. Williams, 375 S.W.2d 279, 281-82 (Tex. 1964). 
However, the conditions do not need to be identical. Id. When there is dissimilarity
in the conditions, the admission of the experiment is within the trial court's discretion
if the differences are minor or are explained to the jury. Id. at 282. It is within the
discretion of the trial court to determine whether the existence of a dissimilarity
between those conditions causes evidence of the experiment to confuse rather than
aid the jury and, thus, whether the evidence should be excluded. Id. at 382; Sosa By
and Through Grant v. Koshy, 961 S.W.2d 420, 430 (Tex. App.--Houston [1st Dist.]
1997, pet. denied).

 The trial court has broad discretion in determining admissibility of an expert's
testimony. Robinson, 923 S.W.2d at 556-57. We can reverse the district court's
determination regarding admission of expert testimony only if the trial court abuses
its discretion. Id. at 558. We analyze an alleged abuse of discretion by examining
whether the trial court acted without reference to any guiding rules or principles. See
id. We cannot find an abuse of discretion merely because we disagree with the trial
court's decision. See id. And we will not reverse a trial court for an erroneous
evidentiary ruling, including an evidentiary ruling regarding the admissibility of
documentary evidence, unless the error probably caused the rendition of an improper
judgment. Horizon/CMS Healthcare Corp. v. Auld, 34 S.W.3d 887, 906 (Tex. 2000);
Owens-Corning Fiberglas Corp. v. Malone, 972 S.W.2d 35, 43 (Tex. 1998).

Reliability of Pearson's Testimony (4)


 Lincoln has not contested Deputy Pearson's qualifications as an expert in
accident reconstruction. Rather, Lincoln argues that Deputy Pearson's testimony
regarding who entered Intersection B on a red light and caused the accident is flawed
because "the underlying data derived from the dissimilar vehicles renders Deputy
Pearson's accident reconstruction unreliable" and "no scientific data [establishes] that
the tires on the 2002 Camaro were similar to the tires on Gregory, Sr.'s car." 

Deputy Pearson's Testimony

 At the Daubert hearing, Deputy Pearson testified that he is assigned to the
traffic enforcement division as an accident reconstructionist on the fatality accident
reconstruction team. He has worked in this capacity for 23 years, attended several
schools for accident reconstruction starting in 1988, and has over a thousand hours
in accident reconstruction training. Deputy Pearson testified that he could determine
who entered Intersection B on a red light by knowing the time at which each light
turned green, how far apart the lights were, the amount of time a vehicle was
traveling, and the amount of time it took the vehicle to stop from the time the driver
reacted. The amount of time to stop the vehicle is determined by calculating the
coefficient of friction for the roadway traveled. He described the coefficient of
friction as "resistance to the tires sliding on a roadway surface once the vehicle's tires
are locked and the vehicle is sliding on a level surface." He restated that "it's the
deceleration rate for a vehicle, at what rate that vehicle will slow down, given the fact
that the wheels are locked and sliding on a roadway surface."

 Pearson testified that there are three different ways to calculate the coefficient
of friction for a particular roadway: (1) a skid test, (2) a drag sled, (5) and (3) a Vericom
performance computer. Pearson stated that he used a Vericom computer to calculate
the coefficient of friction. Pearson testified that the Vericom is an accepted way to
determine the coefficient of friction. The coefficient of friction is "when you have
a vehicle where all four tires are locked and not rotating any more and the vehicle is
sliding on a level surface. The term drag factor is used when you have less than all
four wheels locked and/or a surface that is not level." The Vericom uses drag factor
to calculate the coefficient of friction. The Vericom measures the motion of the car
and the amount of time it was moving. The computer uses accepted mathematical
formulas to take data, and it calculates the drag factor once every 100th of a second
while the vehicle is skidding. Ultimately, it takes the average of the drag factor
throughout the entire skid. Pearson testified that with the known distance of the skid
marks and the coefficient of friction he could determine the minimum speed of the
vehicle at the beginning of the skid marks. 

 Pearson testified that, using the foregoing test, he could determine the
acceleration rate of Gregory, Sr.'s vehicle because Gregory, Sr. started at a stopped
position and traveled a known distance. He could also determine what speed
Gregory, Sr. obtained up to the point at which he first started to react and how long
it took to travel from a stopped position to the point where he first started to react. 
He could then use the acceleration rate, the distance the vehicle traveled, and the
speed to determine how long it took in seconds to go from a stop to a point. Once he
had the speed and knew the distance that the vehicle skidded, he testified, "[W]e can
determine how long it took him to skid from where the skid marks start to where the
impact with the vehicle was, and take those times to add up how long it was from the
time he started from the stopped position to the point where he made impact with the
trailer." Pearson testified that he performed an acceleration test with a Camaro to
check his results because the Mustang was not driveable after the accident. But he
determined the speed of the Mustang based on the information from the coefficient
of friction, (6) not based on the Camaro's capabilities.

 Pearson testified that the Northwestern Reconstruction Manual advises the use
of a test skid to determine the drag factor. The manual instructs, "Duplicate as
closely as possible the conditions under which the accident skid was made. It is best
to use the same vehicle driven in the same direction at the same location and at
approximately the same speed. If the accident vehicle cannot be used, another
vehicle, for example, a police car, can be substituted. Usually this has little effect on
the results." Pearson said that the "Northwestern Reconstruction Manual states that
things such as temperature of the roadway, temperature outdoor, the heat friction, the
weight of the passenger car [are] insignificant, that the only thing to be concerned
with is that your road conditions are the same, you know, wet or dry, but that the tires
are similar." The tires on both the Mustang and Camaro were soft rubber tires, not
regular tires.

 Pearson determined how long it took the Mustang to leave Intersection A after
the light changed to green by using "reaction time from the time he got a green light,
and then again using some perception and reaction time." He also determined the
reaction and perception times by using the Northwestern manual. Pearson ultimately
concluded that, taking into account (1) a half-second reaction time at the light at
Intersection A, (2) 6.07 seconds from the time that Gregory, Sr. left the green light
at Intersection A to the time of the collision at Intersection B, and (3) the fact that the
light at Intersection B turns green seven seconds after the light at Intersection A turns
green, Gregory Sr. entered Intersection B on a red light.

Lincoln's Arguments

 Lincoln argues neither that Pearson's testimony on causation was junk science
nor that the coefficient of friction method of determining the amount of time it took
Gregory, Sr.'s vehicle to stop is not valid. Instead, Lincoln attacks the way in which
Pearson calculated the coefficient of friction. First, Lincoln argues that, because
Pearson used a Camaro, all of the opinions drawn from his calculations are flawed. 
Second, Lincoln argues that the coefficient of friction value that Pearson calculated
is flawed because he did not use a durometer to compare the Mustang's tires with the
Camaro's tires. We analyze these arguments in turn.

Substantially Similar Vehicles

 Lincoln first argues that the trial court erred in allowing Pearson's testimony
because he did not use a substantially similar vehicle in reconstructing the accident. 
 Lincoln argues that 

 1. The police used a different year, make, and model vehicle
to test its hypothesis in this case.

 

 2. The police used an automatic transmission vehicle to
perform its tests when the accident vehicle involved in the
collision had a 5-speed manual transmission;

 

 3. The police used a police "interceptor" camaro with a
substantially more powerful engine to perform the skid and
speed calculations, when no such forceful engine was
involved in this case; 


 4. The police used a vehicle with a completely different
braking system (all-wheel disc brakes) when the braking
system involved in this case had two (2) disc brakes in the
front and two (2) drum brakes in the rear;

 

 . . . 


 7. At least one of the police skid tests was performed from a
running and accelerating position (nonstop) when all
evidence shows that Gregory, Sr.'s vehicle accelerated
from a complete stop;


 8. There is a weight difference between the respective
vehicles of more than 600 pounds;


 9. The police vehicle was only 2 years old at the time of the
collision; while Gregory, Sr.'s vehicle was 15 years old
(meaning different technology would have existed between
the vehicles);


 10. The police Camaro had a horsepower nearly 38% greater
than the horsepower of Gregory, Sr.'s Mustang;


 11. The suspension system between the police vehicle and
Gregory, Sr.'s vehicle is completely different.


 Pearson acknowledged that a number of differences existed between the
Camaro and the Mustang, but he testified that the differences between the two
vehicles had no effect on the coefficient of friction value. When asked if the year,
make, and model of the vehicle were important in determining the coefficient of
friction, Pearson answered "no," unless he was comparing a passenger vehicle with
an 18-wheeler. He also stated that it did not matter that the Mustang had a manual
transmission while the Camaro had an automatic transmission. The difference in
braking system has no effect because "when we're talking about a drag factor for a
vehicle that is skidding, the wheels are locked and sliding. We're not talking about
how efficient or how quick the braking is because there's a difference between
braking and skidding. We're talking about skidding. And once those wheels lock up,
the efficiency of your brakes has nothing to do with it. If your wheels lock up and
stay locked up, then that's all that matters." Pearson testified that neither the size of
the engine nor the type of braking system would have an impact on his results. 

 Pearson also testified that a weight difference of 600 pounds would be
insignificant in determining drag factor because "once the wheels are locked up and
sliding, the weight of the vehicle . . . is immaterial. It's the friction between the tires
and the roadway surface as the tires are sliding." He also testified that the difference
in ages of the two vehicles, 15 years, was insignificant. He also testified that a
difference of horsepower such as 33 percent greater would have no effect on drag
factor. 

 Lincoln cites Fort Worth & Denver Ry. Co. v. Williams to show that the trial
court should have excluded Pearson's testimony. See 375 S.W.2d 279 (Tex. 1964). 
In Williams, an automobile-train collision caused the death of Williams. Fort Worth
Railway introduced evidence of a motion picture film of an experiment made by their
attorney to show that a beam of light similar to the train's light would cause a "wall
of light," obstructing the view of a person approaching the beam. Id. The court of
civil appeals held that the admissibility of the experiment testimony was within the
trial court's discretion because the dissimilarities between the experiment and the
actual event were minor and could be explained to the jurors without confusing them. 
Id. at 282. The Texas Supreme Court reversed and remanded for a new trial. Id. at
284.

 The Williams supreme court noted many differences between the motion
picture and the actual event, which included the following: (1) the position of the
lights and the distances in the experiment were not clear, and the distance of the
actual event was 1,300 feet, not 600 to 700 feet as in the movie; (2) the only evidence
of similarity of the scenes shown on the film and the actual appearance came from an
interested non-expert witness; and (3) there was no evidence establishing the
similarity of the motion picture's light's candlepower and the actual light's
candlepower. Id. at 282-83. Taking all of these differences together, the court
concluded that the experiment did not meet the requisites of admissibility. Id. at 283.

 Here, unlike Williams, the dissimilarities between the Camaro and the Mustang
were acknowledged by a neutral expert, Deputy Pearson, who explained why the
differences did not affect the coefficient of friction value used to determine the time
it took Gregory, Sr.'s vehicle to stop from his reaction point. The differences
between the two vehicles and the reasons why the dissimilarities did not matter could
easily be, and were, explained to the jury. See Williams, 375 S.W.2d at 282 (stating
that trial court has discretion to admit experiment when dissimilarities are minor or
can be made clear by explanation). 

 Lincoln also relies on Mottu v. Navistar International Transportation Corp.,
804 S.W.2d 144 (Tex. App.--Houston [14th Dist.] 1990, writ denied). Mottu
involved a passenger vehicle colliding with a flatbed truck. At the time of the
collision, the truck did not have an underride guard, which might have prevented cars
from riding under the truck in the event of a rear-end collision. Id. at 146. At trial,
the plaintiff sought to admit three videotapes of automobile crash tests depicting the
effect of underride guards, but the trial court excluded the videotapes. The court of
appeals held that the videotapes were cumulative of the expert's testimony, and thus
the trial court did not err. The court further stated that the videotapes were not
admissible because two of the tapes used cars manufactured in the late 1960's,
whereas the plaintiff was riding in a 1977 Ford Thunderbird. The third film showed
a Chevrolet Impala as the test vehicle, which the court noted had a different body
style than the Thunderbird. Id. at 148. The court noted other differences, in that the
truck was anchored and the angle of impact and the speed of the vehicles were all
dissimilar to the actual accident. In effect, the court concluded that the videotapes
were not substantially similar to the actual accident. 

 Just like Williams, Mottu involved a videotaped reconstruction, which is not
at issue in the present case. Moreover, in an experiment attempting to show what
would have happened in a rear-end collision if a truck underguard had been on the
truck, some of the most relevant conditions of the experiment--including the type of
car, year, angle of impact, and speed of the vehicle--were substantially dissimilar to
the actual event. No testimony showed that these conditions were irrelevant to the
matter to be shown, as in the present case. We thus conclude that Mottu is inapposite
to the facts of this case. 

 Here, unlike in Williams and Mottu, Deputy Pearson explained that the only
relevant factor in using a second vehicle, the Camaro, to determine the coefficient of
friction was the similarity of the Camaro's tires to the soft rubber tires on Gregory,
Sr.'s Mustang. He further detailed all of the differences between the vehicles and
explained why those differences did not matter in calculating the coefficient of
friction. Although Pearson did not use the same vehicle that was involved in the
collision to determine the coefficient of friction, the evidence revealed that the
differences were explained and that the differences were immaterial and "readily
understood." Forth Worth & Denver Ry., 375 S.W.2d at 282. Thus, in light of the
testimony and evidence before the trial court, we cannot conclude that the trial court
abused its discretion in allowing Pearson's testimony.

Similar Tires

 Lincoln next argues that Pearson's underlying data and methodology were
unreliable because he did not use a Durometer "to measure and compare the
consistency of the tires," and therefore his opinions were also unreliable. (7) 

 Pearson admitted that a Durometer would have measured the hardness of the
tires' rubber, but he testified that he did not have one at the time the accident
reconstruction test was performed. Because he used a Camaro instead of Gregory's
Sr.'s Mustang in determining the coefficient of friction, Pearson stated that he
determined the hardness of the tire rubber between the Mustang and the Camaro by
eyeballing the tires: "We eyeballed it. And we didn't guess, but we saw that the tires
were of a soft consistency." He admitted that eyeballing the tires was not scientific,
but he testified that his scientific proof was "the testing that I have done involving
similar tires that were involved in this crash, Mustangs, Camaros previously, which
yield similar if not the same results." Pearson stated that the drag coefficient for the
Camaro would be similar to, if not the same as, the drag coefficient for the Mustang. 
He drew this conclusion on the basis of his "experience in doing hundreds of tests
with vehicles with soft rubber tires, regular passenger cars, harder truck tires, and
finding the consistency in those tests that I did with similar tires." 

 Pearson chose the Camaro as a testing vehicle because it had "soft rubber tires
consistent with the wide, slick tires that were on the Mustang, which also
were--consisted of soft rubber." He said that it was important to use the Camaro
because "[i]t gave me under the options I had the tires that were most consistent, the
rubber hardness being that of what would be the same or very close to the same
hardness as the vehicle that was involved in the crash because I wanted to determine
a drag factor that was appropriate for the vehicle that was involved." Pearson
testified that the tires on the Camaro were similar to the tires on the Mustang. 

 Pearson agreed that he did not use the accepted scientific methodology of the
Durometer to test the similarity of the rubber between the Mustang's tires and the
Camaro's tires, but he testified that his years of experience testing the coefficient of
friction with "similar tires . . . , Mustang Camaros previously, which yield similar if
not the same results" supplied scientific proof that the Camaro's drag coefficient
would be similar to that of the Mustang. He also stated that the tires between the two
cars were similar because "[t]he tires were both high-performance cars. For a sports
car, they are both--you could see where both tires that were soft rubber compound. 
And there's physical evidence from everything that was done in this case that shows
that these tires had the same coefficient of friction between the two tires based on the
numbers we have in this reconstruction." He stated that his statement was not circular
because he did not use one number to get the other. He also agreed that a difference
in hardness of the tire rubber can affect the drag factor and ultimately affect the speed
calculated from that factor, but he had not calculated if it would be an appreciable
difference. 

 Pearson testified that he has presented the skid method of determining the
coefficient of friction 15 to 20 times in criminal courts. He agreed that no one has
ever challenged the tires before. In reaching his opinions, Pearson stated that he used
generally accepted accident reconstruction methods that he was taught. He testified
that the same methods were taught at Northwestern University, that Northwestern is
the top place to go for schools, and professors at Northwestern are the "ones who
wrote the book on accident reconstruction." Pearson disagreed that his testing was
unreliable based on his experience in testing vehicles because both of the tires were
high performance tires and "I could tell that both of these were soft rubber tires. And
they would be very consistent in the drag factor that they would both come up with
and would be reliable to use in this case."

 Pearson's testimony shows that, in conducting his accident reconstruction, he
performed a test that is widely used in the same field and it is generally accepted as
being scientifically reliable. A part of Pearson's testing relied upon his subjective
interpretation of the Mustang's tires as compared to the Camaro's tires. This factor
though should be considered along with Pearson's extensive testing done with similar
vehicles with similar tires. Pearson testified that his calculations were taught to him
by Northwestern and that the tests have been published. No evidence was given on
the technique's potential rate of error, but Pearson did admit that a difference in tire
hardness could affect the calculation. No evidence was given on the technique's non-judicial uses. Although he did not use a Durometer to specifically measure the
hardness of the Mustang's tires prior to trial to find substantially similar tires for the
accident reconstruction, (8) Pearson testified that he used tires with the same consistency
as the Mustang's tires. (9) He reached this conclusion based on his many years of
experience as an expert in accident reconstruction, by performing hundreds of tests,
working with the same tires in other tests, and actually looking at both sets of tires. 
 We conclude that Pearson's testimony regarding the coefficient of friction and
causation was reliable in that it was grounded "in the methods and procedures of
science" and was not based merely on "subjective belief or unsupported speculation." 
Robinson, 923 S.W.2d at 557 (quoting Daubert v. Merrell Dow Pharmaceuticals,
Inc., 509 U.S. 579, 590, 113 S. Ct. 2786, 2795 (1993)). Furthermore, his observation
of enough tires to show a pattern is sufficient to support his opinion that the tires were
of similar consistency. See Gammill, 972 S.W.2d at 726. We therefore hold that the
trial court did not abuse its discretion in admitting the expert testimony of Pearson.

Improper Verdict

 Even if we concluded that the trial court erred in allowing Pearson to give
expert testimony, Lincoln has not shown that this testimony led to an improper
verdict. See Horizon/CMS Healthcare Corp., 34 S.W.3d at 906.

 The evidence shows that Lincoln's expert, Richard Schlueter, testified to
calculating virtually the same numbers regarding the time from when the Mustang left
Intersection A until the point of impact at Intersection B. Schlueter testified that the
coefficient of friction for rubber on concrete was between .7 and .8. He got this
number based on published scientific literature. He agreed that he did not put any
kind of vehicle at the scene of the accident to try to determine what the "rubber on the
tires reflected." Rather, he relied upon what scientists rely upon in the published
literature. He calculated that, at the time Gregory, Sr. applied the brakes, he was
traveling between 40 and 43 miles per hour. He testified that it took approximately
4.1 seconds to get from the stop light to the time when Gregory Sr. applied his brakes. 
 When he totaled up the time from Intersection A to the collision, Schlueter got
6.25 seconds, as opposed to 6.57 seconds obtained by Pearson, but, importantly,
Pearson's number included a half second of delay in waiting at the Intersection A
light once the light turned green. Schlueter opined that Gregory, Sr. stayed at the
light for at least two seconds after the light switched from red to green. Adding
Schlueter's 6.25 seconds from the light to the collision site and the two seconds at the
green light equals 8.25 seconds, meaning that Gregory, Sr. had a green light when he
entered Intersection B. Schlueter also testified that Vasquez had a red light and that
he did not slow down. Schlueter concluded that because Vasquez entered
Intersection B on a red light, Vasquez caused the collision. 

 As noted by Lincoln's counsel during trial, the two experts had nearly identical
calculations for the time it took Gregory, Sr. to travel from the green light at
Intersection A to the point of impact at Intersection B, thus demonstrating that their
coefficient of friction values were nearly the same. The only material difference in
the experts' testimony that affected causation was the amount of time that Gregory,
Sr. stayed at Intersection A after the light turned green. (10) Schlueter testified that he
assumed that Gregory, Sr. left Intersection A around two seconds after the light
turned green, and, based upon that number, Gregory, Sr. would have had a green light
when he entered Intersection B. Pearson, however, testified that Gregory, Sr. left
Intersection A a half-second after the light turned green, and based upon that number,
Gregory, Sr. would have entered Intersection B on a red light. 

 Thus, even though Pearson's accident reconstruction did not use the same
vehicle or a Durometer to check the tires, his expert opinion regarding the coefficient
of friction had no bearing on causation--Pearson's ultimate conclusion that Gregory,
Sr. entered Intersection B on a red light. (11) Pearson's testimony that Gregory, Sr. left
Intersection A right away was not drawn from the methodology regarding the tires or
the particular make of the vehicle. Stated another way, whether Pearson used a
Durometer on the Mustang's and Camaro's tires had no bearing on Pearson's
testimony that Gregory, Sr. accelerated as soon as the light turned green at
Intersection A. 

 The jury heard conflicting evidence about the amount of time that it took for
Gregory, Sr. to drive away from Intersection A. Deputies Pearson and Swango both
testified that the eyewitnesses said that Gregory, Sr. left the light as soon as it turned
green. Schlueter testified that he did not. Here, the jury was charged with
determining whom it believed and resolving conflicting issues of fact. See Golden
Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 761 (Tex. 2003). We may not
substitute our opinion for that of the jury. Hollander v. Capon, 853 S.W.2d 723, 726
(Tex. App.--Houston [1st Dist.] 1993, writ denied). Accordingly, even if the trial
court improperly allowed Pearson to testify regarding the coefficient of friction or
causation, we cannot conclude that his testimony led to an improper verdict.

 We overrule Lincoln's first, second, and third issues.

Juror Confusion


 In her fourth issue, Lincoln argues that the trial court's instructions to the jury
were "clearly not enough as evidenced by the jury's multiple questions." 

 During deliberations, the jury sent a note asking, "On Question No. 1, if we
have one item with ten responding no and the other two items are unanimous, do the
ten for that one item need to sign the last page? Do we designate which item had ten
no's?" The trial court proposed to respond with, "Only those who agree to all of the
answers should sign the certificate." Counsel for appellant and appellees had no
objection to the trial court's response. 

 After the jury reached a verdict, the trial court polled the jury. Two of the
jurors answered, "No," when asked whether the verdict was theirs. Because the
charge of the court was signed by the jury foreman only (indicating that the verdict
was unanimous), the trial court sent the jury back to the jury room. See Tex. R. Civ.
P. 294. Counsel for Lincoln moved for a mistrial, which the trial court took under
advisement. (12) 

 After the trial court was back on the record, it instructed the jury to read the
charge and to resume the deliberations. The trial court then read two questions that
it had received from the jury. The first question stated, "We assume that the ten of
us who agreed on all questions needed to sign the last page. We have done so. Is
there anything else we need to do?" The trial court proposed to answer with the
statement, "Once you have read and complied with all of the instructions in the
Court's charge, you are to alert the bailiff." Counsel for appellant and appellees had
no objection to this response. 

 The trial court stated that the jury's second question was, "Do we need to write
something in each blank of the document?" The trial court's proposed response was,
"Once you have read and complied with all of the instructions in the Court's charge,
you are to alert the bailiff." Counsel for appellant and appellees both stated that they
had no objection to the proposed response. The trial court then received another
question from the jury as follows: "May I cross through my signature as presiding
juror and initial it or would you prefer that we sign a new certificate?" The trial court
proposed to respond with, "Please make sure the certificate conforms to your verdict." 
Again, none of the parties had an objection to the proposed response. 

 The jury returned to the courtroom a second time after reaching a verdict that
had been signed by ten jurors. When the trial court polled the jury, two of the jurors
stated that it was not their verdict. At no time did Lincoln argue that the jury was
confused. Lincoln first argued that jury confusion led to an improper verdict in her
motion for new trial. 

 Lincoln attempts to show juror confusion by relying on the affidavit of
Catherine Tabberer. Tabberer, a paralegal, was assigned to poll the jurors. Based on
post-trial discussions with 10 of the 12 jurors, she concluded: 

 Each juror indicated that [D]eputy Pearson's testimony swayed
their decision to find Brian Gregory, Sr. was solely liable for the
accident made the basis of this lawsuit 

 

 There was confusion as to how to answer issue #1. It was thought
that if an answer of "yes" was entered as to Brian Gregory, Sr., no
additional person or entity could be indicated as having contributed to
the accident. 


 To the extent that Lincoln argues that the trial court should have granted a new
trial based on evidence obtained after the verdict was received and accepted, we
conclude that Lincoln's argument has no merit. Juror testimony is limited to
"whether any outside influence was improperly brought to bear upon any juror." Tex.
R. Civ. P. 327(b); see also Tex. R. Evid. 606(b). (13)
 Under Rule 327(b), a juror may
testify about "improper contacts with individuals outside the jury," or "matters or
statements not occurring during the course of the jury's deliberations." Golden
Eagle, 24 S.W.3d at 370. However, a juror "may not testify as to any matter or
statement occurring during the course of the jury's deliberations or to the effect of
anything upon his or any other juror's mind or emotions. . . ." Tex. R. Civ. P. 327(b);
see Golden Eagle, 24 S.W.3d at 370.

 Lincoln has not alleged any outside influence. Rather, she alleges that the jury
was confused during deliberations. Lincoln's proffered affidavit is not proper
evidence at a motion for new trial and could not be considered by the trial court. See
Tex. R. Civ. P. 327(b) (stating that juror's affidavit "concerning matters about which
he would be precluded from testifying" may not be received as evidence); see also
Kendall v. Whataburger, Inc., 759 S.W.2d 751, 755 (Tex. App.--Houston [1st Dist.]
1988, no writ) (stating that all testimony, affidavits, and other evidence is excluded
from consideration by the court when an issue as to jury misconduct is raised unless
outside influence is shown). We conclude that the trial court did not abuse its
discretion in denying Lincoln's motion for new trial on this issue.

 We overrule Lincoln's fourth issue.

Conclusion


 We affirm the judgment of the trial court.




 Evelyn V. Keyes

 Justice


Panel consists of Justices Taft, Keyes, and Alcala.

1. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 590, 113 S. Ct. 2786,
2795-96 (1993). 
2. See E.I. du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549, 556 (Tex. 1995). 
3. Deputy Pearson was not hired by either side for his testimony.
4. It is unclear whether Lincoln is also challenging the testimony of Deputy Swango, who also
testified at trial. At the Daubert hearing, Lincoln never argued that Deputy Swango's
testimony should be excluded or explained why the testimony should be excluded. In her
brief, Lincoln makes a number of references to Deputy Swango's testimony in conjunction
with Deputy Pearson's, but she never specifically states what portion of Deputy's Swango's
testimony should be excluded. Lincoln's brief states in a footnote, "To the extent that
Deputy Swango relied on any of Deputy Pearsons' data and/or methodology, the Court
should find Deputy Swango's opinions equally unreliable and scientifically invalid." Lincoln
has provided no argument, has cited no authorities, and does not specifically state which
portion of Deputy Swango's testimony should be excluded. Thus, we hold that Lincoln has
waived any complaint as to Deputy Swango's testimony. See Tex. R. App. P. 33.1. 
Moreover, the record does not reveal that Deputy Swango relied on Deputy Pearson's
testimony. 

5. Deputy Pearson acknowledged that when a drag sled is used to calculate the
coefficient of friction no vehicles are used in conducting the test and that the drag sled
has been accepted by accident reconstructions for many years. 
6. Deputy Pearson stated that "the coefficient of friction is the force that it takes to slide
the object divided by the weight of the object." He explained that as the weight goes
up, the force goes up. Thus, it did not matter that the Camaro weighed more than the
Mustang and was newer. 
7. Lincoln also argues that Deputy Pearson "never indicated that he factored into the
equation the age of the tires, the tread, or air pressure of the tires." Lincoln's specific
complaint was not raised with the trial court. Thus, this portion of the issue has not
been preserved. See Tex. R. App. P. 33.1.
8. We note that the trial court allowed Deputy Pearson to conduct further tests on the
tires mid-trial. Deputy Pearson used a Durometer on the Mustang's and the Camaro's
tires and filed an affidavit in which he concluded that the tires were substantially
similar. Lincoln objected to the mid-trial testing, and the trial court ruled that the
affidavit and any testimony on the mid-trial testing were inadmissible. Although the
jury did not hear evidence of the mid-trial testing, the trial court could have used this
evidence in its decision to allow Deputy Pearson to testify regarding the coefficient
of friction.
9. We note that Lincoln has cited no authority that a Durometer must be used in accident
reconstruction. Even Lincoln's own expert testified, "typically, hardness values aren't
brought into the mix when you're doing this type of analysis."
10. At the Daubert hearing, Deputy Pearson testified that Gregory, Sr. would have had
a red light for .67 seconds before he entered the intersection. 
11. During cross-examination, Lincoln's counsel asked Deputy Pearson the following:
"So, basically, the disagreement with you in terms of your reconstruction boils down
to whether we accept your half second delay time versus at least two seconds at
[Intersection] A. That's where it come[s] down to, doesn't it? 
12. Although Lincoln indicates that the trial court denied the motion for mistrial, the
record does not reflect that it ever ruled on the motion. Without a ruling on the
motion for mistrial, we have nothing to review. See Tex. R. App. P. 33.1. Even if the
trial court denied the motion for mistrial, the trial court's decision was not an abuse
of discretion in light of Rule 294. See Tex. R. Civ. P. 294. Texas Rule of Civil
Procedure 294 entitles a party to have the jury polled when the verdict is returned:


Any party shall have the right to have the jury polled. A jury is polled
by reading once to the jury collectively the general verdict, or the
questions and answers thereto consecutively, and then calling the name
of each juror separately and asking the juror if it is the juror's verdict. 
If any juror answers in the negative when the verdict is returned signed
only by the presiding juror as a unanimous verdict, or if any juror
shown by the juror's signature to agree to the verdict should answer in
the negative, the jury shall be retired for further deliberation.


Tex. R. Civ. P. 294.
13. Rule 606(b) provides:


 Upon an inquiry into the validity of a verdict or indictment, a juror may
not testify as to any matter or statement occurring during the jury's
deliberations, or to the effect of anything on any juror's mind or
emotions or mental processes, as influencing any juror's assent to or
dissent from the verdict or indictment. Nor may a juror's affidavit or
any statement by a juror concerning any matter about which the juror
would be precluded from testifying be admitted in evidence for any of
these purposes. However, a juror may testify: (1) whether any outside
influence was improperly brought to bear upon any juror; or (2) to rebut
a claim that the juror was not qualified to serve.


 Tex. R. Evid. 606(b).